Exhibit A

G62ERAWS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

              v.                             15 CR 377(AJN)

STEVEN RAWLINS,

                 Defendant.

------------------------------x

                                             June 2, 2016
                                             2:58 p.m.

Before:

                    HON. ALISON J. NATHAN,

                                             District Judge

                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  ANDREW DeFILIPPIS
     Assistant United States Attorney

SULLIVAN & BRILL
     Attorney for Defendant
BY:  STEVEN BRILL

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

G62ERAWS

```
 1              (In open court)

 2              MR. DEFILIPPIS:  Good afternoon, your Honor.  Andrew

 3    DeFilippis for the government.  With me at counsel table is FBI

 4    Special Agent Christopher Delzotto, as well as paralegals Mary

 5    Diaz and Holly Meisner from our office.

 6              THE COURT:  Good afternoon to all of you.

 7              MR. BRILL:  Good afternoon.  Sullivan & Brill by

 8    Steven Brill for Mr. Rawlins.

 9              How are you, your Honor?

10              THE COURT:  Good afternoon, Mr. Brill.

11              Good afternoon, Mr. Rawlins.

12              I thank everyone for their patience.  I apologize for

13    the delayed start.

14              We're here today for sentencing in United States vs.

15    Steven Rawlins, 15 CR 377.  In preparation for today's

16    proceeding I have reviewed the probation report, which is dated

17    February 5, 2016.  I have received and reviewed the following

18    additional submissions:  I have objections to the presentence

19    report from Mr. Brill on Mr. Rawlins' behalf dated May 10,

20    2016.  I have the sentencing submission on behalf of

21    Mr. Rawlins which is dated ECF-filed on May 26th, 2016.

22    Attached to the written submission are a series of letters from

23    friends and primarily family of Mr. Rawlins.

24              I did receive today an additional letter dated -- or

25    it might have come in yesterday, ECF-filed June 1, 2016, and
```

G62ERAWS

1    dated on the letter May 26, 2016 from another friend, close

2    friend of Mr. Rawlins.

3          In addition to those materials from the defendant, I

4    received the government's sentencing submission, which was

5    ECF-filed on May 31st, 2016.  I also received -- and, again,

6    these came in yesterday; they're dated June 1, 2016 -- two

7    victim impact statements.  And I received -- I got it today, it

8    may have come in yesterday -- a proposed preliminary order of

9    forfeiture as to specific properties and money judgment

10   submitted by the government.

11         Counsel, is there anything else I should have in front

12   of me for purposes of sentencing?

13         MR. DEFILIPPIS:  Not from the government, your Honor.

14         MR. BRILL:  Nor from the defense.

15         THE COURT:  And can you confirm that you've each

16   received the other's submissions?

17         MR. DEFILIPPIS:  Yes, your Honor.

18         MR. BRILL:  Yes, confirming.

19         THE COURT:  And I should say I also presided over the

20   trial.  And the government's submission relies heavily on trial

21   transcript excerpts, as well as evidence received during trial.

22   And I have refreshed my memory with respect to the testimony

23   from trial in preparation for today's proceeding.

24         Turning to the presentence report, Mr. Brill, I

25   obviously know that you have it.  For the record, have you

G62ERAWS

reviewed the presentence report and discussed it with your

client?

          MR. BRILL:  Yes.

          THE COURT:  And, Mr. Rawlins, I'm going to make sure

you have an opportunity to review the presentence report and

discuss it with Mr. Brill.

          THE DEFENDANT:  Yes.

          THE COURT:  And point out to him any errors that you

felt existed in the report.  You had an opportunity for that?

          THE DEFENDANT:  Yes.

          THE COURT:  And, Mr. DeFilippis, can you confirm for

the record, as I know that you did, but that you, too, reviewed

the presentence report?

          MR. DEFILIPPIS:  I did, your Honor.

          THE COURT:  Let me ask the government first if there

are any objections to the -- putting aside the calculation of

the guidelines for a moment, any objections to the report

regarding factual accuracy?

          MR. DEFILIPPIS:  We have no objections, your Honor.

          The only factual issue, I guess, that arose is that

the victim impact letters and the analysis done by the

companies as to their losses does differ from the losses that

the government asserts were proven at trial.  We have been

informed by the companies that they would like -- if your Honor

is not prepared to rule on the letters and the attachments,

G62ERAWS

1    they would like the opportunity to achieve what they believe is

2    the correct restitution number for restitution purposes.  But

3    the government's view of the guidelines is not changed by that.

4    And we would rest on our submission for that.

5              THE COURT:  All right.  So I guess the question is --

6    and I have not -- since those came in yesterday, I have not

7    been able to thoroughly incorporate them into my conclusions or

8    really try to figure out what the discrepancies are.

9              I do think -- and I think this is your point -- for

10   purposes of the guideline calculation, given the range of

11   numbers involved in loss amount, I can come to that conclusion,

12   even noting the discrepancy, and then could take additional

13   briefing or further proceeding with respect to restitution.

14             MR. DEFILIPPIS:  I think that's the government's view

15   as well, your Honor.

16             THE COURT:  Mr. Brill, any concerns with that?

17             MR. BRILL:  No.  I, too, just received that letter,

18   those letters, and then was informed actually today that there

19   is a desire on behalf of the company to seek that restitution

20   amount, which, again, is different from the loss amount for

21   guidelines purposes.  But I have no objection to exploring

22   that, exploring the loss amount, as has already been briefed,

23   and then dealing with the restitution issue subsequent to that.

24             THE COURT:  What about forfeiture?

25             MR. DEFILIPPIS:  Your Honor, we submitted to your

G62ERAWS

1    Honor and to defense counsel as well the proposed order.  That

2    number in the forfeiture order is based on the trial-proven

3    loss amounts, which is what the government is seeking.  And

4    then it includes several specific property items, jewelry.  But

5    the forfeiture amount there, the government is seeking the

6    losses that were proven at trial or, in our view, were proven

7    at trial.

8            THE COURT:  Mr. Brill, I guess the question is just

9    whether there's any desire to take up forfeiture after today,

10   in conjunction with the restitution determination, or whether,

11   as with the guideline calculation, it makes sense to proceed to

12   address forfeiture today as well.  I'm open to suggestions.  I

13   don't know when you received the proposed order of restitution

14   today.

15           MR. BRILL:  Today.  Well, you mean forfeiture, your

16   Honor?

17           THE COURT:  Sorry.  Yes.

18           MR. BRILL:  Yes, today.

19           THE COURT:  Mr. DeFilippis, do you have a view as to

20   whether it need be taken up today?

21           MR. DEFILIPPIS:  Your Honor, in our view I think --

22   and it may depend on your Honor's view of our assertions in the

23   memorandum about the loss amounts.  In our view I think it

24   would be fine to impose forfeiture, and then because

25   restitution has to be done just within 90 days, to impose

1   forfeiture in a sentence and then address just the restitution

2   issues later.  I think that would be fine with the government.

3          THE COURT:  Let's see where we get to at the end of

4   the proceeding, or as we pick up following the loss amount

5   discussion.

6          With respect to the objections to the presentence

7   report, Mr. Brill, I think what we need to do is to go through

8   each of these.  And you tell me if there's a continuing

9   objection, and I'll make a ruling.  Some of them have impact, I

10  think, on the discussion of loss amount.  It's certainly -- and

11  some don't.  So --

12         MR. BRILL:  I agree.  A lot of it is -- I mean, the

13  objections that impact the guidelines were elucidated in the

14  sentencing submission.  But the objections also include just

15  additional comments that provide further background to some of

16  the findings that were made by probation, which are outside of

17  the guideline calculation.

18         THE COURT:  Right.

19         Mr. DeFilippis, let me ask you this:  So obviously

20  contested are three aspects of the guideline calculation.  With

21  respect to objections to the presentence report that don't

22  impact those conclusions, does the government have any

23  objection to me adopting the recitations in the objections?

24         MR. DEFILIPPIS:  No, your Honor, no objections.

25         THE COURT:  So maybe, Mr. Brill, if you could just --

G62ERAWS

1    if everyone could help me identify, therefore, which of these

2    objections are going to be adopted and which remain in issue.

3                MR. BRILL:  Okay.  Well, I'll refer to the letter of

4    May 10th, which included those objections.  I mean, your Honor

5    doesn't want me to read -- does your Honor want me to read the

6    objections for the record?

7                THE COURT:  No.  No.  It's part of the record.

8                MR. BRILL:  Okay.

9                THE COURT:  And I think many of them I can just adopt

10   as -- just give you an example.  I mean, picking one example,

11   on page five, page 13, paragraph 56, objection to the term

12   domestic violence, and then explanation for the dispute that

13   led to that arrest.

14               MR. BRILL:  Right.

15               THE COURT:  I have no difficulty accepting that

16   description and having it incorporated into the PSR.

17               MR. BRILL:  Right.

18               THE COURT:  Also, page five, adding language that

19   Mr. Rawlins' parents are ill and elderly, they depend on him

20   for numerous day-to-day items.  I have no problem.

21               So I think the question is, if we could identify which

22   objections are extraneous to the three issues in context with

23   respect to the guideline calculation.

24               MR. BRILL:  Yes.  Well, I mean, perhaps -- I'll do

25   that.  And then if the Court feels that --

1          THE COURT:  I'm going to change course, Mr. Brill.

2     Let's get to the discussion.  I'll state my conclusions, and

3     based on argument and the evidentiary record, and then I think

4     that will make dealing with any outstanding objections easy to

5     incorporate.

6          MR. BRILL:  Okay.

7          THE COURT:  So I'll set aside -- maybe I'll state it

8     this way for the record, and you tell me if there's any

9     concerns with this.

10          Setting aside the objections that are raised here that

11     go to the defense's arguments as to the appropriate guideline

12     calculation, for the moment, I do otherwise accept those

13     objections and incorporate them by reference into the PSR.

14          MR. BRILL:  Thank you.

15          THE COURT:  Any concerns with that?

16          MR. DEFILIPPIS:  I don't think so, your Honor.

17          THE COURT:  Okay.  So with that caveat noted and

18     obviously otherwise, as we'll take up in our discussion of the

19     appropriate guideline calculation, I otherwise do accept the

20     factual recitations set forth in the PSR.  The PSR will be made

21     a part of the record in this matter and placed under seal.  If

22     an appeal is taken, counsel on appeal may have access to the

23     sealed report without further application to this Court.

24          So with the caveat that we're setting aside for the

25     moment the facts that go to the guideline calculation and that

1    I've otherwise accepted the May 10, 2016, objections to the

2    presentence report, I am otherwise adopting the factual

3    recitations set forth in the PSR.  Okay.

4           So we'll turn to the guideline calculation.  I begin

5    by noting I'm no longer required to follow the United States

6    Sentencing Guidelines but I am still required to consider the

7    applicable guidelines in imposing sentence, and must,

8    therefore, accurately calculate the sentencing guideline range.

9    As I understand the papers and have previewed, I understand

10   there will be three factual issues in dispute that go to the

11   appropriate guideline calculation:  The loss amount, the

12   enhancement for sophisticated means, and the obstruction of

13   justice enhancement.

14          Who would like to address these first?

15   Mr. DeFilippis?

16          MR. DEFILIPPIS:  Yes, your Honor.

17          First, as to the loss amount, I think, as is laid out

18   in our brief in some specificity, we have certainly beyond a

19   preponderance, and we submit beyond a reasonable doubt, given

20   that we had a trial here, proven that the loss amount

21   significantly exceeded $9.5 million.

22          The first piece of that loss amount is based on the

23   analysis done first by the companies prior to trial, and then

24   further refined by the FBI, which is the approximately

25   $8 million in losses to Prime Health and Core Choice, the vast

1    majority of that in this analysis being allocated to Prime

2    Health.  It was 294,000 approximately that the FBI determined,

3    based on one year of analysis, was suffered at Core Choice.

4    The company now has done additional work, but for these

5    purposes that $8 million -- the testimony at trial established

6    the methodology that was used to come up with that $8 million.

7              THE COURT:  And that's in the 2011-to-2013 time

8    period?

9              MR. DEFILIPPIS:  Exactly, your Honor.  It did not

10    include the 2009 and 2010 period.

11              So you heard at trial a detailed testimony about the

12    methodology for arriving at that number.  It first included a

13    compiling and vetting process by the company.  @Scott center,

14    who you heard from on the stand, was the controller.  And he

15    described how they assembled the transactions initiated by

16    Mr. Rawlins, how they tried to determine which were for

17    authorized versus unauthorized purposes.  They sought

18    documentation for transactions that they suspected were

19    unauthorized, both within the company and ultimately from

20    Mr. Rawlins, with no success, and compiled spreadsheets that

21    were, in Mr. @Center's words, weeded out for transactions

22    determined to be legitimate.

23              After that process these records were turned over to

24    the FBI.  The FBI conducted further analysis with the benefit

25    of bank and credit card records that had been obtained pursuant

G62ERAWS

1   to grand jury subpoena.  And so we looked further as to what

2   the purpose for these transactions were.  Again, they removed

3   transactions when they learned that they had legitimate

4   authorized purposes.  And that number there is the final result

5   of the work of Agent Delzotto and the FBI.  So we would submit

6   that we have proven certainly well beyond a preponderance that

7   those funds were misappropriated by Mr. Rawlins.

8          As to the earlier years, 2009 and 2010, that is where

9   Agent Delzotto did a less formal, less

10  transaction-by-transaction based analysis.  But he looked at

11  ledgers and records of the company that was Prime Health to see

12  what -- were there similar patterns of funds transfers

13  initiated by Mr. Rawlins?  Were they going to entities that had

14  been used to receive or -- fraudulent transactions in the later

15  years?  And based on that analysis, Agent Delzotto estimated

16  that approximately 2 million to 3 million dollars in funds were

17  misappropriated by Mr. Rawlins during those years.  We're

18  asking conservatively that your Honor estimate about 2 million

19  to be conservative.  But, again, Agent Delzotto's best estimate

20  based on the records he looked at was 2 to 3 million.

21         So those are the core losses proved at trial with

22  regard to the two main victim companies.  Beyond that, there

23  was the 1.3 million in intended loss to Janet Godard.  The

24  guidelines include both intended loss and actual loss.  And

25  your Honor will recall that Ms. Godard was the owner of

1    Aerofund, which was a factoring company.  And the essence of

2    Mr. Rawlins' behavior towards Ms. Godard was that he asked her

3    for a $1.3 million cash advance based on a falsified contract

4    reflecting receivables that he was owed of over $8 million from

5    Philip Morris.  So in other words, he used this falsified

6    contract in order to -- intended to obtain $1.3 million.

7    Ms. Godard thought something didn't smell right about this

8    deal.  She did not turn over that money.  So it's intended, as

9    opposed to an actual loss, but under the guidelines should be

10   included.

11          Then there's 1.5 million of intended loss to

12   Dr. Steven Gass.  This emerged, your Honor, in the context of a

13   debt that Mr. Rawlins had to Bank of America.  He attempted --

14   or he defrauded Sal Aurora, obtaining $1.3 million from

15   Mr. Aurora by, again, presenting these fraudulent Philip Morris

16   contracts.  After receiving that money from Mr. Aurora and

17   giving it to Bank of America, he then solicited Dr. Gass over

18   e-mail for 1.5 million.  It was not provided, but, again, that

19   is intended loss.

20          And finally, your Honor --

21          THE COURT:  Just on that, you dropped a footnote on

22   the appropriateness of inclusion of the 1.3 million in light of

23   the fact that the bankruptcy trustee ultimately did return the

24   funds to Aurora, right?

25          MR. DEFILIPPIS:  Yes, most of the funds.  Yes.  And

G62ERAWS

```
 1   our view there, your Honor, is that absolutely that -- given
 2   the testimony, Mr. Aurora said that he was paid back a year and
 3   a half after the loan was made.  The loan was made in August of
 4   2012.  So that brings us to, say, January/February of '14.
 5   That was significantly after the fraud was detected.  And if
 6   someone is paid back after the fraud is detected, then, in
 7   fact, it does count towards the loss amount, regardless of
 8   whether they were paid back.
 9            So we do believe that it can properly be included in
10   the loss amount, and certainly would ask your Honor to do that,
11   if your analysis otherwise puts the number under 9.5 million.
12   But, again, the other losses that we've enumerated we think get
13   us well over 9.5.
14            THE COURT:  But that calculation does include the
15   1.5 million related to the same --
16            MR. DEFILIPPIS:  Yes.
17            THE COURT:   -- repayment of the Bank of America loan?
18            MR. DEFILIPPIS:  It does.
19            THE COURT:  As with respect to Dr. Gass?
20            MR. DEFILIPPIS:  Yes.  And so those are the first I
21   guess four categories of losses.
22            The final one, your Honor, is the $67,000 in actual
23   losses to Shane Gaddes, the founder of Westcrete, Incorporated.
24   That was the construction start-up company.  And he testified
25   that Mr. Rawlins obtained $67,000 from him over the course of
```

1    time, promising to get financing for the company.  He was

2    never -- obtained financing, never repaid the money, never

3    provided documentation to give evidence of any fees, which was

4    the purported reason he needed that money.  So that $67,000 is

5    actual loss to Mr. Gaddes.

6            And so adding all of that up, even if we exclude the

7    Sal Aurora money, the 1.3 million from the bankruptcy trustee,

8    it still comes to about 12.9 million, your Honor.  So that's

9    the loss issue.

10           I'm happy to proceed to --

11           THE COURT:  Well, I'll hear from Mr. Brill.

12           MR. BRILL:  So --

13           THE COURT:  And just to start, I did have you confirm

14   by letter that you wish to make arguments based on the existing

15   record and have considered, but declined to seek, an

16   evidentiary hearing?

17           MR. BRILL:  That's correct, your Honor.  Yes.

18           So I think just a couple things, just to start off,

19   that I think deserve to be mentioned.  First, as I've

20   reiterated in my submission, Mr. Rawlins denies, essentially

21   denies the loss entirely.  His claim, as it was at trial, was

22   that any moneys that essentially came from Prime Health or Core

23   Choice in the fashion that it came, whether it be wires, checks

24   or made payable to American Express cards to cover Mr. Rawlins'

25   personal expenses, were permitted and authorized by Mr. Sharp

G62ERAWS

1    and others within the company and known by them.

2          So I think that just for the sake of this particular

3    argument, that we're assuming that your Honor has essentially

4    accepted this particular loss amount as fact, but that I do

5    want to again reiterate that there's a denial that Mr. Rawlins

6    essentially was unauthorized in receiving this particular

7    money.

8          But given the verdict, obviously, the loss is

9    something that needs to be addressed.  Mr. DeFilippis mentioned

10   proven beyond a reasonable doubt as a result of trial.  I think

11   it deserves as clarification that the jury didn't find

12   particular loss amount in this particular case.  They did

13   obviously convict Mr. Rawlins of wire fraud, but there is no

14   finding by the jury beyond a reasonable doubt that they found a

15   particular loss amount as to what Mr. Rawlins was responsible

16   for.

17         So essentially we object to various aspects of the

18   government's calculation when it comes to loss.  You know, I

19   think that, assuming that the Court is satisfied that between

20   Mr. Center and Agent Delzotto at trial, that they have

21   established through formal process roughly $8 million in loss

22   between Prime Health and Core Choice, we object to any finding

23   by this Court above that particular amount for the following

24   reasons:  First is that by the government's own admission, the

25   additional 2 to 3 million dollars -- and as Mr. DeFilippis

1    says, conservatively $2 million —- was essentially derived by

2    Agent Delzotto in a less formal, less

3    transaction-by-transaction basis.  And I think, based on that

4    record, and based on the fact that it differs from the record

5    before you with respect to the 8-plus million dollars that was

6    established between Mr. Center and Agent Delzotto on the stand,

7    that I don't believe that that rises to the level of

8    preponderance.

9              And I think the Court or the government had the burden

10   to present to this Court similar evidence, as it did with

11   respect to the $8 million, as it should have done with respect

12   to the 2 to 3 million dollars that it alleges was also part of

13   Mr. Rawlins' scheme during the years of 2009 to 2010.  It is

14   sort of an extrapolation that, because we see a pattern —- and

15   I'm sort of paraphrasing what the government's argument seems

16   to be —- because we see a pattern in 2009 and 2010 that moneys

17   went to similar places controlled by Mr. Rawlins, and in

18   similar fashion, that therefore we should include that in the

19   loss amount as it pertains to something as serious as this,

20   which is a guideline calculation which would control

21   Mr. Rawlins' guideline I think is inadequate, insufficient and

22   doesn't rise to that level that the Court should —- the Court

23   deserves in order to find by a preponderance of the evidence

24   that the loss calculation should include that particular

25   number.

G62ERAWS

1        THE COURT:  Mr. Brill, do you have any -- I understand

2   the point, but I wonder if you have any authority for the

3   proposition that the kind of pattern identifying an illogical

4   approach that was testified to is insufficient for purposes of

5   a preponderance determination.

6        MR. BRILL:  The answer to that is, no, I don't have a

7   case that says the Court should be wary of evidence that is

8   gathered in a less formal process and attempted to be proven,

9   because it is similar to losses that were indeed proven in a

10  different way.

11       I think the best that I can offer this Court is the

12  idea that it is a different analysis, and it is a less

13  sophisticated analysis.  And it is a less formal analysis.  And

14  if there is life in the preponderance of the evidence standard,

15  then given the difference, you know, our position is that the

16  way in which they derived the 2 million to 3 million dollars

17  loss, despite the fact that it matched a pattern with respect

18  to the other losses, does not overcome that burden.

19       So I think this is more of a perhaps discretionary

20  decision, obviously, and I don't have particular case law to

21  say one way or the other, other than the fact that the Court

22  obviously must find by a preponderance of the evidence that the

23  government has proven their loss amount.

24       Our additional objection is to the $1.3 million of

25  intended loss to Ms. Godard.  Obviously it goes without saying

G62ERAWS

1    that this is not actual loss but intended, in that --

2              THE COURT:  You don't dispute that intended loss may

3    appropriately be considered?

4              MR. BRILL:  No, absolutely not.  But what I do dispute

5    is that despite the fact that your Honor permitted that

6    evidence at trial for perhaps some relevant basis with respect

7    to the evidence at trial, we would object to the idea that it

8    is irrelevant conduct with respect to sentencing, in that we

9    are assuming that it is all true; that what essentially what

10   we're dealing is what we would argue -- again, assuming for the

11   purposes of this discussion -- is an additional fraud that is

12   an attempt to seek money from Ms. Godard as -- and use a forged

13   document from Philip Morris in order to do that.  And to

14   intertwine that particular conduct and that particular

15   intended -- that particular conduct by Mr. Rawlins in his

16   intention to seek that particular money in his conduct with

17   respect to stealing from Prime Health and Core Choice, I think,

18   would be a mistake and be unfair for the purposes of

19   sentencing; in that if an individual is essentially charged

20   with committing a fraud, and then in addition to that attempts

21   to commit another fraud with different parties using different

22   means and in a different way, then -- you know, which I think

23   is what went on with respect to Ms. Godard -- then I think that

24   we're not dealing essentially with relevant conduct to the

25   instant matter, which is whether or not -- well, the fact that

G62ERAWS

1    Mr. Rawlins was convicted of defrauding Prime Health and Core

2    Choice.

3            So based on relevant conduct standard, we don't

4    believe that it rises to that level, despite the fact that the

5    Court may find that a fraud was committed and that intended

6    loss was something that the Court believes to have occurred.

7    Whether or not the Court can then use that loss with respect to

8    Mr. Rawlins' sentence, with respect to the wire fraud

9    allegations pertaining to Prime Health and Core Choice I think

10   is another story.  And we would object if the Court did that.

11           With respect to the $1.5 million request from

12   Mr. Gass, that, I think, was brought out actually by an e-mail.

13   I think that e-mail was either mentioned in the government's

14   submission or -- yes, in the government's submission.  You

15   know, it is a -- again, assuming -- well, withdrawn.

16           The idea that Mr. Rawlins sought $1.5 million from

17   Mr. Gass with respect to a bankruptcy proceeding with respect

18   to Bank of America, it is essentially true on its face in that

19   given the e-mail, Mr. Rawlins essentially sought that

20   particular money.  And I'm not sure -- maybe the government can

21   clarify if I've gotten this wrong, but that the -- the reason

22   that Mr. Rawlins sought that money from Mr. Gass was the real

23   reason that there was indeed an obligation to pay Bank of

24   America with respect to a bankruptcy proceeding.  And indeed,

25   with that particular e-mail, that's what was told to Mr. Gass.

G62ERAWS

1     So unless the government can point to some allegation

2   this was fraudulent per se and that there was something that

3   was similar to the aspect of criminal conduct with respect to

4   other losses, other attempts that Mr. Rawlins made to receive

5   money, then we would argue that that, too, that 1.5 million

6   attempt from Mr. Gass, should not be included in the Court's

7   loss calculation.

8         THE COURT:  Let me just make sure I understand.  So

9   the contention there is if you look at the evidence the

10   government points to with respect to this, there is no fraud

11   there?  He asked for 1.5 million from Gass to repay the Bank of

12   America loan, and nothing suggests that that wasn't exactly

13   what he was doing?  Is that the --

14         MR. BRILL:  That's the argument, your Honor.  And

15   indeed, there was an obligation to pay Bank of America.  So,

16   you know, there is a truth in that particular argument and

17   that, in fact, there was that obligation to do just that.  So I

18   think if the Court is going to analyze that particular part of

19   the loss and that conduct, then I think that the Court should,

20   in light favorable to Mr. Rawlins, should obviously look at

21   whether or not that intention was indeed what Mr. Rawlins set

22   it out to be.

23         And again -- well, lastly, we would object to the

24   $1.3 million that is a footnote at this point.  I know the

25   government is somewhat -- I mean, I don't want to speak for

1    them, but somewhat on the fence as to whether or not that

2    should apply.  That shouldn't apply.  I know they feel they're

3    already over the 9.5 million threshold, but assuming that the

4    Court agrees with our particular arguments, then I think the

5    fact that Mr. Aurora was paid back by bankruptcy court should

6    alleviate any notion that Mr. Rawlins should be -- that a

7    guideline calculation should include that particular money when

8    this comes to the intended loss, the actual loss at the hands

9    of Mr. Rawlins.  So I think the repayment of that particular

10   money is important enough that the Court should disregard that

11   particular money as well.

12          Again, if the Court agrees with our arguments with

13   respect to the additional, less formal calculation that Agent

14   Delzotto made, the 1.3 million with respect to Ms. Godard, then

15   the 1.5 sought from Mr. Gass and 1.3 from Mr. Aurora, then

16   we're not over the threshold of the 9.5 million loss amount,

17   but yet at a level below.  So instead of adding 20 levels to

18   Mr. Rawlins' base offense level, the Court, if it agrees with

19   the defendant, should add only 18.

20          THE COURT:  Thank you.

21          Briefly, Mr. DeFilippis, can you address -- I'm going

22   to work backwards from the questions that were raised.  With

23   respect to the 1.5 million request from -- to Dr. Gass, could

24   you take on the contention which is all you've pointed to in

25   the memorandum is Mr. Rawlins asking for what he needed.

G62ERAWS

1          MR. DEFILIPPIS:  Yes, your Honor.  And I think when

2     taken in isolation, I can see why one might try to argue that

3     it was not a fraudulent approach or transaction.

4          But I think, taken in the context of the defendant's

5     behavior here, it absolutely is.  First, immediately preceding

6     this was an effort by Mr. Rawlins that we now know, looking in

7     hindsight, was a fraud against Mr. Aurora; showed him a Philip

8     Morris contract that was falsified; obtained $1.3 million,

9     which it's now clear he never intended to pay back, probably

10    knew he could not pay it back; and obtained it on false

11    pretenses.

12         He then on the same day, he obtains that money that he

13    knows he will never pay back, goes to Dr. Gass and says, hey, I

14    need you to fill the rest of my debt to Bank of America.  Well,

15    if he knew he couldn't pay back the first half, he certainly

16    knew he'd never pay back Dr. Gass.  And then at the end of the

17    e-mail actually represents to him that, if you help me in the

18    next several hours, you will be rewarded well.  Again,

19    promising even more reward above simply the doing of a favor.

20         And so, your Honor, I think, taken in the context not

21    only of this transaction but all of the defendant's behavior

22    over the course of years, this was just one more effort by

23    Mr. Rawlins to extract money that he had no intention of paying

24    back, and that he falsely represented to Dr. Gass that he would

25    not only pay back but reward him well.  And so I think it's

G62ERAWS

1      that aspect of it that unambiguously makes it fraudulent,

2      because he's making that false representation which we know in

3      the context of all his other behavior could not have been true.

4              THE COURT:  Just out of curiosity, I don't have the

5      exhibit in front of me, but the portion you cite doesn't

6      actually say, I'll pay you back.

7              MR. DEFILIPPIS:  You're right, your Honor.  I'm just

8      flipping to the right page here.  It says reward you well, or

9      something like that.

10             THE COURT:  You will be rewarded well.

11             MR. DEFILIPPIS:  And our contention is when you ask

12     someone for a loan, it's absolutely implicit that you'll pay it

13     back.  And then we think that was clearly implicit in the

14     conversation.  The additional representation, you'll be

15     rewarded well, was, I'll do something even more than pay it

16     back.  At least that's how we would read it.

17             THE COURT:  Your response, then -- this is moving back

18     up to the first general -- first point, once we get beyond the

19     Core Choice and Prime Health approximately 8 million, with

20     respect -- well, with respect to the other years, the

21     extrapolation methodology, Mr. Brill has said that it just

22     is -- particularly when you contrast it with the

23     transaction-by-transaction approach taken for 2011 to 2013, it

24     falls short.  The government falls short of meeting that

25     standard.

G62ERAWS

1          MR. DEFILIPPIS:  Your Honor, we would argue that under

2    a preponderance standard, it certainly doesn't fall short.  It

3    was not that there was no methodology or no effort made.  There

4    was an effort made on multiple occasions to review records, to

5    identify patterns.  And I wish I had, your Honor, a case that

6    says it, but I recall in writing the brief that all the Court

7    has to do is make a reasonable estimate as to loss.  And that

8    can include extrapolation based on numbers of victims and time

9    periods and things along those lines.  The Court is not

10   required to fastidiously account for each penny of the

11   estimated loss.  It has to make a reasonable effort.

12          So we'd submit that that reliance on Agent Delzotto's

13   analysis would be reasonable here, particularly when we know

14   that the fraud spanned over that time period.  And I would note

15   just as a side note to the previous discussion, the reason that

16   the Sal Aurora money is in a footnote here is not at all

17   because we're not confident that it could be included or should

18   be included.  Again, it's because we believe these other losses

19   get us over the figure.  The guidelines are unambiguous that if

20   the loss is repaid after the fraud is detected, that it counts.

21   And so there's no wiggle room there in the guidelines.

22          Here, the companies actually sent letters to the

23   defendant in the end of 2013 asking for money back.  They

24   hadn't discovered the full amount of the loss then.  So it had

25   been brought to his attention.  The guidelines don't even

G62ERAWS

1   require that. All they require is that the defendant

2   reasonably know that the loss was detected or was soon to be

3   detected. And we would argue that perhaps even a year before

4   that the defendant should have known his loss would be detected

5   in strings of e-mails where he was being questioned about

6   payments. So sorry to add that footnote but ...

7          THE COURT: Okay. And my last question, and it's a

8   version of the argument made by Mr. -- there's a general

9   argument that is reliant on essentially Mr. Rawlins' testimony

10  about his beliefs as to authorization and the like. So at the

11  most muscular level he contends none of this should be included

12  in the loss amount. That's his denial as to liability, as well

13  as to the specific amount.

14          I suppose there's a less extreme version of that,

15  which is to say -- and there's some testimony in a culture of

16  some less than precise bookkeeping, although, yes, a jury

17  determined him liable and some amount of this, but maybe --

18  it's difficult to know whether this is a contention or a

19  version of the contention. It's difficult to know whether to

20  include all of it, given that there might have been some amount

21  of authorization implicit.

22          MR. DEFILIPPIS: Your Honor, I think the methodology

23  that the companies undertook and that the FBI undertook was

24  designed to address that by looking not only at whether there

25  was documentation for a particular transaction -- and I think

1  the fact that -- as my understanding of the trial record, there
2  was virtually nothing provided by Mr. Rawlins for any of these.
3  So I think that fact alone speaks volumes that, you know, maybe
4  if there were documentation for half, you would say he was
5  sloppy.

6          But virtually nothing, you know, again, as I recall
7  from the trial, was produced to substantiate any of this.
8  Combined with the fact that the company also -- there's a
9  reasonable expectation that if company money is going out the
10 door, there's going to be some at least understanding after the
11 fact as to what it was for and what purpose it advanced for the
12 company.  And as to these transactions, there wasn't that.

13         So on both sides there was nothing you would expect of
14 a legitimate transaction.  And so we think both of those kind
15 of drive towards the same conclusion.

16         THE COURT:  Thank you.

17         As to sophistication, Mr. DeFilippis?

18         MR. DEFILIPPIS:  Yes, your Honor.  So as the case law
19 suggests on sophistication, while the standard is that the
20 offense conduct need to be complex or especially intricate,
21 that does not mean that every aspect of the scheme must be
22 complex or especially intricate.  And, in fact, when you look
23 at the whole of the scheme, that's what the Court is called to
24 do, to look at all of the methods that the defendant used, and
25 in taking them in the aggregate is the scheme complex or

1    sophisticated?  And here we submit that it absolutely is.

2            First, your Honor, all of this fraud emanated from the

3    defendant's network of companies.  He had several companies,

4    BRI Resources, Inc.  He had Rawlins Capital Group, Rawlins

5    Capital Corporation, BRI Business Services; all of these

6    different companies that he used essentially to shuttle money,

7    to shied money, to obscure the real essence of what he was

8    doing, which was taking money from these two companies.

9            And the charts displayed by Agent Delzotto in his

10   testimony showed that.  He essentially started with several

11   bank accounts from the companies and had this money filter into

12   a whole different series of entities so that it wasn't all in

13   one place.  It wasn't all identifiably being stashed so that it

14   could be uncovered and recovered.  And so we think that alone

15   adds complexity to this scheme.  He wasn't just simply moving

16   money from one place to another.

17           He also routinely made inflated false representations

18   about himself and his businesses to give the impression that he

19   was an extremely successful businessman, someone very well

20   respected in the industry, posted on his website major Fortune

21   500 corporations that he claimed were, quote, our clients but,

22   in fact, he had no relationship with, as entered through a

23   stipulation at trial.

24           So again, this piece of his conduct was, your Honor,

25   akin to -- we're not saying it's equivalent to, but it's akin

1    to the enumerated grounds for a sophisticated means enhancement

2    in the guidelines, which is the use of shell companies and

3    fictitious entities.  It was of that flavor of activity where

4    he's using a kind of a manufactured network in order to conceal

5    a fraud.  So that was the first aspect that we think counsels

6    in favor of sophistication.

7         The second are all of the fraudulent documents, the

8    forged signatures.  He forged Brian Sharp's signature on an

9    altered contract with Prime Health services.  I mean, the most,

10   you know, sort of galling aspect of this was the Philip Morris

11   documents.  He actually had documents bearing Philip Morris

12   letterhead, with the fictitious name of an employee based in

13   Switzerland, and showed it to multiple people in order to

14   convince them that he was owed over $8 million.

15        There are cases, your Honor, we cite which say that

16   using forged documents in the context of a larger, more complex

17   scheme counsels in favor of a sophisticated means enhancement.

18   He also forged the signature of his own employee, Ella

19   Chadwell, on a mortgage application for his son, which, again,

20   we think just adds to the multifaceted nature of his fraud.  He

21   was not only defrauding the companies but misappropriating his

22   employees' names in order to achieve personal gain.

23        And then perhaps the most persuasive aspect that

24   counsels in favor of the enhancement is his use of the Fifth

25   Third bank account that was held in Prime Health Services'

G62ERAWS

1    name.  That bank account we learned at trial had been opened by

2    the company in an effort to obtain a loan.  I guess it was a

3    requirement to have a checking account with the bank in order

4    to get a loan.  The loan was obtained.  And the account sat

5    dormant.  Nobody knew.  The CEO didn't know that that ever

6    would be used.  It was opened just to get a loan.

7              What Mr. Rawlins did is he opened, activated the

8    checking account, started using it to receive funds from other

9    Prime Health Services accounts, mainly through checks, which he

10   made look like purely internal transfers.  The purpose of that

11   was so -- and again, Mr. Rawlins was the only one receiving

12   statements for the Fifth Third account.  So money that was

13   going in, people at the company could see money going from a

14   Prime Health account to another account and would assume it's

15   some sort of internal transfer.  What Mr. Rawlins did on the

16   back end of that account -- in other words, the parts that

17   would only show up in the statements for that account -- was

18   transfer the funds to his own accounts, both credit card and

19   bank accounts.

20             And so this was a sophisticated way to allow the fraud

21   to continue, to mask his fraud by making it appear like a

22   series of internal transactions, but to funnel money out the

23   back door of the company into this network that he maintained.

24   And so, your Honor, we think that taken together, all of these

25   means, while each one on its own might not support a

sophisticated means enhancement, taken together, they certainly

paint the picture of a fraud that was complicated and

intricate.

THE COURT:  Thank you.

Mr. Brill?

MR. BRILL:  Thank you.

I think it's important to just say that this is a

fraud case.  And in fraud cases, people -- in any fraud case

there is stealing involved.  And if there is stealing involved,

then there is an attempt by the person who is doing that

stealing to hide that stealing, unless the person has the

intention to get caught or has some other motive in mind, other

than taking the money that the person wants to take.

So, you know, I think it's important not to confuse

any type of fraud case or wire fraud case with the idea that it

automatically rises to the level of sophisticated means.  That

guideline is an important one, and it should be saved for

frauds that are really sophisticated and are really complex and

are really intricate.  I mean, the guidelines don't say

"really."  The idea is they try to distinguish what is

sophisticated and what is just -- I think I'm quoting a case in

another circuit -- a garden variety fraud or a generic fraud,

which is the stealing of money and trying to hide that stealing

so that you have the money and can get away with it.

So the idea that there's secrecy, the idea that

1    there's some type of concealment, the idea that there is an

2    attempt to do these things does not automatically make it

3    sophisticated.  The idea that some documents are forged is not

4    a sophisticated concept.  You don't have to be sophisticated or

5    complex or an intricate person to come up with that particular

6    plan to create a letterhead on your computer -- not conceding

7    any of these arguments -- and then to portray that letter as

8    being real.  The idea that you open bank accounts in your name,

9    as the allegation is, and put money into there in your name is

10   not automatically sophisticated but could be a good way to try

11   to conceal the particular money that you're trying to take

12   without authority.  So I don't think the record supports a

13   sophisticated means enhancement.

14        I know there's a Fifth Circuit case called *Valdez*.

15   And I'm sorry, I don't -- actually, I do.  726 F.3d 684 out of

16   the Fifth Circuit, 2013 case, where the Court does not find

17   sophisticated means and mentions generally why they don't.  In

18   that case there are no false names used by the defendant.

19   There are no fictitious entities used by the defendant.  There

20   are no shell companies.  I think it's a real stretch what the

21   government is arguing, that because he allegedly misled people

22   on his website that he had certain clients is -- it's not

23   really all that sophisticated either.  And dare I say, you

24   know, there are people that are not sophisticated that are

25   inclined to build themselves up and may exaggerate their

G62ERAWS

particular past.  Obviously I'm not condoning that, but it
doesn't make it sophisticated or a shell company if they do
that.

There are no complicated financial transactions,
meaning that what we have here is -- again, assuming for the
argument here, and understanding that Mr. Rawlins denies it,
but assuming it is true, what we have here is essentially an
above-board stealing of money which essentially is, let me
write a check from an account that belongs to Prime Health.
It's not as if Mr. Rawlins necessarily didn't open up this
Fifth Third account, where the allegation is that the money
flowed through there.  This is a Prime Health account.

And I think that there is evidence at trial that
statements came to Prime Health, and I think it was Ms. Haywood
that perhaps received the statements.  And I think someone may
have asked her if she saw the statement or opened the statement
or noticed the moneys going through there.  But that's
certainly not concealment or certainly not sophisticated
concealment, especially when the bank account belongs to a
Prime Health or Core Choice.

Furthermore, on that similar point is that the money
that came -- the money which was presented at trial went from
this account and perhaps again into Mr. Rawlins' other bank
accounts, again, in his particular name, was then used to pay
off American Express expenses.  Also Mr. Rawlins' name.  So

1    it's essentially at its core the stealing of money to pay your

2    credit card so you can buy luxurious things.

3           And the way in which you do that is you use one of the

4    company's bank accounts in their name and send the money to an

5    account that is in your name.  So, again, the Court should

6    distinguish between a generic or an ordinary wire fraud case

7    and whether or not the person used sophisticated means.  And

8    I'm sure the Court, either in its personal experience or is

9    aware of cases where there's real sophistication and real

10   intricacy when it comes to stealing particular money.  But the

11   idea that someone does steal it by using different bank

12   accounts in their name or trying to hide it from the people

13   they're stealing from certainly doesn't make it sophisticated.

14          There was no expert that was brought in to trial by

15   the government to establish that, ladies and gentlemen of the

16   jury, you might not understand this but here is what was really

17   happening here.  That wasn't done because the jury and all of

18   us, when it's presented, can understand the evidence.  And so

19   it's hard to argue that it was so sophisticated if it was

20   essentially ordinary.

21          So we would object to that enhancement.

22          THE COURT:  All right.  Thank you.

23          Obstruction?

24          MR. DEFILIPPIS:  Yes, your Honor.  And if I may have

25   one point on the sophistication.

1          Perhaps one of the most sophisticated things the

2     defendant did was the opening of the Coface insurance policy,

3     where he not only -- he essentially went to Coface, an

4     insurance company, and fraudulently opened it by claiming a

5     bunch of receivables from Prime Health and Philip Morris.  And

6     this is, to be honest, your Honor, it's the kind of insurance

7     policy that I'd never heard of before this case.  It's a fairly

8     complex kind of receivables insurance, where you are

9     essentially insuring yourself against a nonpayment of something

10    you're owed from another company.

11         He gets the insurance policy by claiming receivables

12    from Prime Health.  In other words, he and Franklin Palm are

13    purporting to protect themselves against a default from Prime

14    Health.  He then goes into Prime Health's books and deducts

15    over $300,000 for purported insurance.  When questioned about

16    that eventually, he claimed that this was insurance obtained

17    for Prime Health's benefit.  In fact, it was insurance that he

18    had obtained but not actually paid for to protect his company

19    against a default from Prime Health.

20         So it's this very complicated leveraging of a fraud

21    against a fraud, which we think, again, underscores that this

22    was not an unsophisticated scheme.  This was a complicated

23    scheme.  Even understanding the insurance itself isn't easy,

24    and he's leveraging it to extract money from Prime and then

25    cover it up when asked about it.

1           Your Honor, moving to the obstruction, we think there

2    are several separate bases in the record to conclude that

3    Mr. Rawlins committed perjury and is, therefore, appropriate to

4    apply the obstruction enhancement.  The first were his

5    assertions on multiple occasions on direct and

6    cross-examination -- your Honor alluded to these before -- that

7    he was authorized to carry out all of the transactions he

8    undertook on behalf of Prime Health and Core Choice.  That was

9    flatly contradicted by the testimony of Brian Sharp.  It was

10   flatly contradicted by the testimony of Dr. Gass.

11          And it wasn't limited to just general assertions by

12   Mr. Rawlins that he was authorized or vague assertions that he

13   was authorized.  In fact, on cross-examination, he was shown at

14   least four specific e-mails where Brian Sharp said to him, stop

15   withdrawing funds in large amounts from credit cards, on credit

16   cards.  Stop withdrawing funds.  Multiple occasions he was

17   shown those e-mails and said, did you understand that you were

18   authorized to do this even after receiving this e-mail?

19   Absolutely, were the answers.  And it was so flatly implausible

20   and so flatly incorrect that we think those alone support a

21   finding that he committed perjury and that he's eligible for

22   the enhancement.

23          Second, your Honor, his attorney on redirect asked

24   him --

25          THE COURT:  And just to spit out materiality, it goes

G62ERAWS

1    to the core of fraud, which was expenditure of unauthorized --

2              MR. DEFILIPPIS:  It does.  That is really the essence

3    of the fraud.  He was asked on redirect by his attorney, did

4    you, quote, do anything to conceal the wires or checks from

5    Brian Sharp?  And those were the ones that were alleged to have

6    been used for personal expenses.

7              Mr. Rawlins responded, absolutely not.

8              I think our entire discussion earlier about the Fifth

9    Third account, among other things, the false notations in

10   company records that particular payments were for taxes or fees

11   or due diligence, all of those were plain efforts by

12   Mr. Rawlins to conceal his withdrawal of funds, and so we think

13   make that statement absolutely not in response to, did you do

14   anything to conceal the wires or checks from Brian Sharp?

15   Again, a flat falsehood.  He did many things to conceal his

16   withdrawals from Brian Sharp.

17             And then finally, your Honor, and this may be the

18   strongest example, but your Honor may recall there was a

19   bankruptcy deposition in which Mr. Rawlins in 2011 was shown an

20   independent accountant's report that had been submitted to the

21   Bank of America by Mr. Rawlins' company.  And it purported to

22   be an independent analysis of his company's financials from an

23   actual group called Hubbard Financial Services.  Mr. Rawlins,

24   it turns out, was shown this document during the bankruptcy

25   deposition in 2011.  And he was asked, did you prepare this

1    document?  And he was asked in four separate ways, which we lay

2    out in our briefing, you know, did you prepare the document?

3    On each occasion his answer was yes, I do, or yes, or as an

4    example of what we had requested he prepare for us, and then

5    finally asked when he prepared it, exactly.

6          Then came trial.  And on cross-examination he was

7    shown the same document.  He was asked if he prepared it, and

8    he said no.  Who prepared it?  Franklin Palm.  That was a

9    purported associate of Mr. Rawlins.  That, your Honor, we think

10   is plain as day that he said one thing in one proceeding,

11   another thing here.  Why did he do it?  He did it because the

12   document had essentially been revealed as fraudulent in the

13   prior proceeding.  It was something that Hubbard Financial

14   Services did not endorse, and yet his company submitted it to

15   Bank of America.  He actually agreed on the stand in this trial

16   that it was, quote, absolutely and wholeheartedly agreed it was

17   a fraudulent document.  So the motive was clear why he wanted

18   to distance himself from it here.  It was a fraudulent document

19   submitted by his company.  And he lied to distance himself from

20   that.

21          Your Honor --

22          THE COURT:  And the materiality of that?

23          MR. DEFILIPPIS:  The materiality of that is that,

24   again, it goes into the pattern or course of conduct of his

25   fraud, which was repeatedly and continually to misrepresent the

G62ERAWS

1   financial stability and success of himself and his companies in

2   order to engender trust from financial institutions, from

3   victims, in order to pump up his image as a way to get money.

4              THE COURT:  But he didn't do that in his testimony

5   here, right?  He distanced himself from a fraudulent report

6   that did that.

7              MR. DEFILIPPIS:  That's right, your Honor.  But,

8   again, he lied in an effort to distance himself from those --

9   from his fraud, from his fraudulent efforts to lie about his

10  company and his business and his success.  He lied about a

11  matter that was absolutely material to this case and this

12  fraud, which was his efforts to do that.

13             THE COURT:  Okay.  Mr. Brill?

14             MR. BRILL:  So again, your Honor, this enhancement

15  also calls just for the point to be made that, as we all know,

16  a defendant has the utmost constitutional right to take the

17  stand and testify in his own -- in his or her own defense.  And

18  the courts make it very clear that they do not -- I think they

19  go out of their way to make sure that an obstruction of justice

20  enhancement or perjury enhancement, as it's called, is not

21  utilized in any way to burden a defendant's right to do that.

22             So with all due respect, I ask the Court to, again --

23  respectfully I say this -- to keep that in mind only because it

24  involves the most sacrosanct aspect of our system, which is

25  that a defendant should be -- obviously they don't have a right

to commit perjury, but they should be completely unfettered if

they desire to take the stand in their defense and testify to

their theory of their defense and to deny the allegations made

by the government.  And a denial of the allegations made by the

government, and at the same time testifying that what they did

was legitimate and what they did was proper and what they did

was authorized, as Mr. Rawlins did, does not in and of itself

automatically mean perjury, despite the fact that the jury came

to the opposite conclusion.

        So I think it's really important to mention the idea

that there needs to be a clear-cut case that there was perjury

that was different from Mr. Rawlins testifying in his own

defense and denying the allegations that the government made

against him.

        The three aspects or the three instances that the

government cites are essentially that he committed perjury

because he believed what he said on the stand, that he was

authorized to make withdrawals and wires.  Well, that is the

crux of the theory of the case.  So it is hard for me to

understand how we distinguish or how the Court can distinguish

his testimony to that fact as his denial of guilt and his

belief and distinguish that from the government's argument that

this is a -- pure lies and perjurious.

        The evidence that the government uses to make that

particular point is that there are e-mails that were drafted by

1   Mr. Sharp that Mr. Rawlins was shown, and then asked if he

2   still believed that he had the authority to make those

3   withdrawals.  Well, it is Mr. Rawlins' belief that there was

4   appearances made by Mr. Sharp that there was an understanding

5   between him and Mr. Sharp, and that he still believed, despite

6   the language of the e-mails, that he was in the position of

7   authority and had the permission to use those -- that

8   particular money as compensation for the services that he

9   rendered.

10          The e-mail's not all that -- as concrete as the

11   Court -- I'm sorry, as the government wants the Court to

12   believe.  Mr. Sharp mentions no withdrawals for large,

13   quote/unquote.  So what does that mean?  Does that mean he had

14   permission to withdraw money for things other than large?  And

15   what is large?  So it is not altogether black and white that,

16   when asked if Mr. Rawlins still believed he had permission to

17   make those withdrawals, that it was clear that he didn't, and

18   he was lying when he said that he did.  The concealment of the

19   withdrawals when he was asked whether or not he did that from

20   Mr. Sharp, I think the Court -- I cite the Court to my other

21   argument with respect to sophisticated means, which is how

22   concealed were they?

23          This was an account, the Fifth Third account, that was

24   utilized for the money to come in and out.  Sharp had access to

25   it.  It was a Prime Health account.  So when asked, did he

G62ERAWS

conceal these withdrawals from Mr. Sharp, you know, I think

that in the very least it passes a straight-faced test that he

did nothing to conceal those items because Mr. Sharp was aware,

essentially aware of the money leaving the company and going

into an account that the company had access to and started.  So

I don't think that's a black-and-white issue either.  And I

think that it certainly is not clear enough to say that he

committed perjury when he denied whether or not he concealed

these particular withdrawals.

          And lastly, the deposition testimony.  I think your

Honor's questions hit the nail on the head.  I think that's the

best point with respect to that last item.  And I think it's a

stretch for the government to argue that that is material to

this particular case.  I mean, this case involves the stealing

of Prime Health and Core Choice.  That is the bulk of the

allegations of the loss, substantial portion of the loss.  And

whether or not there is an instance where Mr. Rawlins, you

know, gives an inconsistent statement with respect to what he

did with respect to a document that has really nothing to do

with this case, that it was part of the bankruptcy proceeding

in 2012 and it was really utilized, I think, by the prosecutors

here just to establish lack of credibility, it certainly didn't

go to the proof.

          Certainly the jury is not going to acquit or convict

Mr. Rawlins based on the idea of whether or not -- you know,

1    what his answers were with respect to a document that stemmed

2    from a prior bankruptcy proceeding. That is what impeachment

3    is for. And that is a classic prior inconsistent statement;

4    that if he made a statement at a deposition in a separate

5    proceeding that the government feels is inconsistent with the

6    one he made here in court, then they have every right to

7    impeach him. And the prosecutor here during cross-examination

8    did just that.

9            And so on top of that, to say, oh, yes, and it's

10   perjurious and he obstructed justice when he gave an

11   inconsistent statement I think is a dangerous thing. But I

12   don't think it rises to the level of materiality. So we would

13   object to that particular reason as well.

14           I think the record is insufficient to establish such a

15   serious enhancement as this one.

16           THE COURT: All right. Thank you.

17           And I'm just going to give you my conclusions on the

18   calculation. Any other objections to -- I suppose, Mr. Brill,

19   to the government's proposed calculation?

20           MR. BRILL: No.

21           THE COURT: And so, Mr. Brill, I think I understand.

22   You make a general argument about loss amount consistent with a

23   total denial of -- based on a contention of authorization.

24   Setting that aside, understanding that's preserved but setting

25   that aside, you would argue for a calculation of an offense

1    level of 27, because 18 base levels is 7 and 18 for the loss

2    amount you contend --

3              MR. BRILL:  That would be 25, your Honor.

4              THE COURT:  So -- right.  Well, go ahead.

5              MR. BRILL:  No, I'm sorry.  I'm sorry to cut you off.

6              THE COURT:  That's all right.

7              MR. BRILL:  I didn't know you gave a total amount.

8    Just with respect to loss, we would seek or recommend a finding

9    of 7 plus 18, which is 25.

10             THE COURT:  Right.

11             MR. BRILL:  Yes.

12             THE COURT:  And then 7 plus 18 -- I'm just going to

13   the PSR.  So 7 plus 18, 25.  You argue against the two-level

14   enhancement.  You don't argue against the adjustment for role.

15   So that would be plus two, which gets us to 27?

16             MR. BRILL:  You're correct.

17             THE COURT:  And then you argue against the obstruction

18   enhancement.  So it would be a total of 27?

19             MR. BRILL:  That's correct.

20             THE COURT:  Which would be with a criminal history

21   category of I?

22             MR. BRILL:  70 to 87 months.

23             THE COURT:  Range of 70 to 87.  Okay.

24             Let me state my conclusions on the calculation and

25   then hear general arguments.

1          Turning to loss amount, I do conclude that the

2     government has established by a preponderance of the evidence

3     that the loss amount exceeds $9.5 million.

4          First, the evidence at trial established that

5     Mr. Rawlins' fraud was responsible for approximately $8 million

6     in loss to Prime Health and Core Choice during the period of

7     2011 to 2013.  To name some of the evidence I rely on for this

8     conclusion, it includes but is not limited to the testimony of

9     Scott Center and the testimony of Special Agent Delzotto.  And

10    with respect to Scott Center's testimony, particular reliance

11    on Government Exhibit 486; and with respect to Agent Delzotto's

12    testimony, Government Exhibit 490.  As a general matter I'll

13    state I did find the testimony of both Mr. Center and Special

14    Agent Delzotto to be thorough and credible and responsive, and

15    that's the first aspect of my conclusion.

16         Second, the evidence at trial established that

17    Mr. Rawlins engaged in approximately $2 million in fraudulent

18    transactions at Prime Health and Core Choice during the 2009 to

19    2010 period.  And here, I rely again on the credible testimony

20    of Agent Delzotto, as well as Government Exhibits 513-9 and

21    513-10.

22         Third, as to relevant conduct that was intended loss,

23    the trial record also established by a preponderance of the

24    evidence that Mr. Rawlins intended to inflict an additional

25    $1.3 million in losses upon Janet Godard of Aerofund.  I recall

G62ERAWS

well Ms. Godard's credible testimony in this regard and

understood what was described consistent with my relevance

determination, as consistent with the overall fraud being

established, and pattern as well.

I'm also including in my calculation a related conduct

established by preponderance of the evidence concerning the

$67,000 in losses to Shane Gaddes and Mark Sobel, the

Westcrete, Inc. individuals who also testified credibly at

trial, as well as the $1.5 million sought of Dr. Gass with

requests to repayment of the Bank of America loan.

I'm not including the $1.3 million obtained by

Mr. Rawlins from Mr. Aurora. I think it probably could be

included, but I need not come to conclusion as to the

appropriateness of that, in light of the repayment of those

funds, although I think it is undisputed that the repayment

occurred after the fraud.

The primary argument in opposition to all of these --

there are several arguments, but the primary argument is that

Mr. Rawlins was in one way or another entitled or authorized to

receive the expenses or withdraw the funds. I'll state more

about this in connection with my conclusion regarding

obstruction, but I simply did not find Mr. Rawlins' testimony

on these points credible, and his contentions were refuted in

my view beyond a reasonable doubt, but certainly by a

preponderance of the evidence. And that is consistent

1   certainly with the jury's verdict.

2          And I, too, rejected it and conclude that the

3   appropriate loss amount, based on the preponderance of the

4   evidence, is calculable with reasonable certainty to at least

5   $9.5 million but less than $25 million.  And, therefore, 20

6   points must be added to the offense level pursuant to

7   2B1.1(b)(1)(K).

8          As to the sophisticated means enhancement, as the

9   application note indicates and case law supports, sophisticated

10  means refers to especially complex or especially intricate

11  offense conduct, and includes hiding assets or transactions

12  through the use of fictitious entities, corporate shells or

13  offshore financial accounts.  As the law makes clear in this

14  circuit, each step need not be elaborate but may be deemed

15  sophisticated if all the steps, when linked together, exploit

16  different vulnerabilities and different systems in coordinated

17  way.

18         The government has established again by a

19  preponderance of the evidence that that was the case here.

20  Mr. Rawlins' scheme used a complex network of entities.  He

21  used elaborate methods in carrying out this fraud for an

22  extended period of time.  And it includes, but is not limited

23  to, concealment of wire transfers through falsified business

24  records, secret use of a company bank account, as well as

25  forged documents and contracts.  I do think the example

G62ERAWS

```
 1    Mr. DeFilippis noted here of the fairly complicated insurance
 2    policy structure that has been described as leveraging of the
 3    fraud against the fraud is but one example of a complicated
 4    transaction that was used here to facilitate this substantial
 5    fraud.
 6              And I did look quickly at the *Valdez* case Mr. Brill
 7    cited and think it readily distinguishable.  This was not
 8    generic falsifications, nor garden variety, but I think fits
 9    cleanly into the enhancement's application.
10              And as I've indicated now, turning to the obstruction
11    of justice enhancement, based on my observations of
12    Mr. Rawlins' testimony, which I deemed not credible and which
13    was directly contradicted by substantial other evidence,
14    including multiple credible witnesses and significant
15    documentary proof, I conclude that Mr. Rawlins did give false
16    testimony at trial that was material to the fraud.
17              For example, he repeatedly asserted that he had
18    authorization for his expenditures from Brian Sharp.  He was
19    shown specific e-mails from Mr. Sharp to the contrary, and I
20    well remember Mr. Rawlins' entirely implausible testimony that
21    in the face of those unambiguous e-mails, and in light of
22    Mr. Sharp's credible testimony about them, Mr. Rawlins
23    nonetheless testified that he continued to believe he had
24    authorization following receipt of them.  And that was a deeply
25    noncredible statement offered here in court under oath and
```

G62ERAWS

1    goes, as discussed with counsel, to the core of the fraud

2    allegations here.

3        And I'll just say, I think it's -- I honor well the

4    right to testify, to deny allegations asserted by the

5    government.  Mr. Rawlins did exercise that right, but he made

6    false and material statements and specific and continued

7    falsities during his testimony that readily allows the

8    application of the obstruction enhancement here.

9        He also materially and falsely denied that he took

10   steps to conceal wires and checks used for personal expenses

11   from Sharp and did so again in the face of abundant documentary

12   and credible witness testimony to the contrary.  He may well

13   also have attempted to falsify an independent accountant's

14   report as part of his efforts to deceive others regarding the

15   legitimacy of his claims of consultancy work and falsely denied

16   it here.

17       For all of these reasons, I must apply the two-point

18   enhancement for obstruction pursuant to 3C1.1.

19       Therefore, using the November 1, 2015 edition of the

20   sentencing guidelines, I do conclude that the base offense

21   level was 33.  The criminal history category here is I, in

22   light of zero criminal history points.  And, therefore, the

23   sentencing guideline range is 135 to 168 months.

24       Turning to formal departures upward or downward within

25   the guideline system, I think I understood the arguments to be

G62ERAWS

 1     made here in the briefing to go to 3553.  And so I just want to

 2     confirm that neither side seeks an upward or downward departure

 3     within the guideline system.

 4                 MR. DEFILIPPIS:  That's right for the government, your

 5     Honor.

 6                 MR. BRILL:  Yes, your Honor.

 7                 THE COURT:  Thank you.

 8                 I have, nevertheless, considered whether there's an

 9     appropriate basis for departure from the advisory range within

10     the guideline system and did not find grounds warranting

11     departure, although I am open, as has been argued in the

12     papers, to hearing arguments with respect to variance.

13                 Mr. DeFilippis, does the government wish to be heard

14     further with respect to sentencing?

15                 MR. DEFILIPPIS:  Yes, your Honor.  And we do have --

16     your Honor may be aware, but we do have one victim who would

17     like to speak.  I can speak either before or after that victim,

18     whatever your Honor prefers.

19                 THE COURT:  I'll let the -- and the name of the

20     person?

21                 MR. DEFILIPPIS:  It's Dr. Gass, Dr. Steven Gass.

22                 THE COURT:  Dr. Gass may speak.  If you would, sir,

23     come to the podium.

24                 DR. GASS:  Good afternoon, your Honor.

25                 THE COURT:  Good afternoon.

1          DR. GASS:  First, I'd like to thank the Court for

2    giving us this opportunity to speak.  I'm also speaking on

3    behalf of Brian Sharp and Prime Health Services, as Mr. Sharp

4    was unable to be here and had to remain in Tennessee because

5    his wife had surgery this week, and he had to help out with

6    family matters.

7          We would also like to thank Andrew Bauer, formerly of

8    the US Attorney's Office; Andrew DeFilippis of the US

9    Attorney's office; Christopher Delzotto of the FBI; and the

10   respective staffs for the tireless work and for the excellent

11   job that they did.  They are bright young men and women.  And

12   we believe that they have bright futures ahead of them.

13         It gives me no great pleasure to be here today,

14   because this is a situation that should have never happened.

15   We all have been put through unnecessary hardships because of

16   Mr. Rawlins' devious actions.  And it has affected all of us

17   professionally and personally.

18         Mr. Rawlins used all of his efforts to deceive, to

19   subvert and ultimately steal approximately $9 million from

20   Prime Health Services and approximately $1 million from Core

21   Choice, and who knows how much from other people, in an

22   egregious manner in order to personally enrich himself, all at

23   the expense of trusting and hard-working people.

24         Mr. Sharp has asked me to specifically state that

25   while Mr. Rawlins supported his lavish lifestyle by abusing his

G62ERAWS

position of trust, Brian Sharp found his company in the

constant financial and organizational struggle.  One of

Mr. Rawlins' primary responsibilities was to enhance Prime

Health and later Core Choice's financial status and facilitate

their growth.  But his deceptive criminal actions generated the

opposite result.

        Over the course of the five years with Prime Health

Services and three years with Core Choice, Mr. Rawlins

embezzled millions of dollars and took elaborate steps to cover

it up.  Actions like this have predictable and far-reaching

effects on Prime Health Services and Core Choice as both

companies attempted to grow.  Mr. Sharp would also like it to

be known that Mr. Rawlins' multiyear embezzlement also affected

employee morale, as both companies weren't able to grow at the

rate that they should have, given their place in the industry.

        His long-standing fraud scheme left both companies

strapped, unable to hire new employees, improve benefits or

raise the salaries of current employees who were taking on

extra workload.  Even after the fraud was uncovered, employees

had to spend significant amounts of time and work long hours

trying to figure out and clean up the many problems created by

Mr. Rawlins' actions.  The net result was a frustrated work

force struggling to catch up on their day-to-day work.  The

fact that Mr. Rawlins stole the Core Choice payroll from

November of 2013 shows the callous and uncaring manner in which

G62ERAWS

1   he operated.

2          Our employees, two of which are here today, depended

3   on their paychecks to pay their bills, their rents, their

4   mortgages and feed their families.  The employees of Prime

5   Health Services, many of whom I know very well -- and my

6   employees are honest, hard-working people who have great

7   attitude and care about the work that they do.  In fact, your

8   Honor, in our case, Core Choice, he nearly forced Core Choice's

9   very existence.

10          I guess what shocks me personally even more is the

11   fact that he perpetrated this massive fraud against his

12   so-called dear friend, Brian Sharp.  This makes it very evident

13   to me of his sociopathic mantra and his failure to take

14   responsibility.

15          Further, to this day he has no remorse.  It is

16   actually amazing, with the events that have transpired in this

17   prosecution and conviction, that the actions of Mr. Rawlins

18   continue to harass us.  It's like a chronic disease that just

19   keeps coming back.

20          Most recently, I was contacted by the Internal Revenue

21   Service that the payroll taxes for the fourth quarter of 2012

22   were not paid.  And when we researched the issue, we found that

23   those funds were withdrawn from our payroll account and

24   transferred to one of Mr. Rawlins' accounts.

25          He even had the misguided notion that I am the one who

1    turned him in to the government.  While it is not true, and I

2    was not the one that did, I surely wish I had been.  I guess

3    with age comes wisdom, and in my mind to be able to work hard

4    and provide for my family and children, grandchildren, is what

5    is important.  The values exhibited by Mr. Rawlins here are

6    just not what is acceptable in proper society.  And he needs to

7    know that.

8            I realize at the beginning of this investigation that

9    we probably would never recover very much here, which is why we

10   have worked even harder to make Prime Health Services and Core

11   Choice the entities that they are today.  I am happy that the

12   truth has come out.  And it is my hope that Mr. Rawlins

13   receives the harshest penalty allowed by law, so that he never

14   have the opportunity to do this to anyone again.  To me, that

15   would be justice.

16           Again, thank you collectively to the government for

17   protecting us against the likes of this individual.  And I hope

18   that this will serve as an example to anyone who even thinks of

19   doing this or doing anything like this to anyone else again.

20           Thank you, your Honor.

21           THE COURT:  Thank you, Doctor.

22           Mr. DeFilippis?

23           MR. DEFILIPPIS:  Yes, your Honor.  Thank you.

24           Your Honor's very familiar with the facts of this

25   case, with the trial record.  You presided over the two-week

G62ERAWS

trial.  And sentencing is a time when the government candidly
is responsible for telling the Court the aggravating and
mitigating factors here.  And, your Honor, looking at the
record and at the defendant's behavior here, it is very
difficult to find even any mitigating factor in Mr. Rawlins'
conduct.

As Dr. Gass mentioned, the nature of this fraud was
heinous.  It was despicable.  It wasn't someone who preyed
randomly on strangers.  It wasn't someone who engaged in
one-off instances of dishonest conduct.  It was systematic.  It
was methodical.  And most alarmingly, it targeted the people
who trusted and liked him the most; his closest friends, his
closest business associates, and ultimately enlisting his very
family.

So, your Honor, in terms of the nature of the scheme,
Mr. Rawlins is deserving of the harshest penalty, because it
was an ultimate betrayal.  He was given enormous trust by these
companies and by the people around him.  And he in a very
calculating, very cold and very methodical way repeatedly
betrayed that trust over the course of years.

Also, in terms of the nature of the defendant himself,
he came from by all accounts what seems to have been a good
family, a comfortable background.  He had a perfectly normal
and comfortable life and did this with no possible reason,
motive or explanation.  He carried out this fraud as a graduate

G62ERAWS

of the Vanderbilt business school, as someone who was respected
in his community and presumably his industry.  And yet he
decided to do this.  He decided to take and take and take
money, having not faced any disadvantage or hardship that would
explain such behavior.

Your Honor, the defendant over the course of time was
confronted.  He was initially -- he had every opportunity to
cease his fraud, to reconsider his conduct over the course of
years.  We saw the e-mails where he was questioned about
withdrawals, questioned about why particular transactions were
being taken.  And every time it was more excuses, it was more
lies, it was more manipulation.  The defendant made no effort
to come to grips with his conduct and no effort to stop what he
was doing.

Your Honor, Dr. Gass said better than the government
could the effects that the fraud had on his company and
Mr. Sharp's company.  But there were also very real individual
victims of Mr. Rawlins' fraud.  And you heard the testimony of
Shane Gaddes from Westcrete, Incorporated, who literally was
rendered to living in his car because of the $67,000 that he
lost because of Mr. Rawlins' fraud.  His life was enormously
disrupted by Mr. Rawlins.  And he even to this day may not have
recovered from those effects.

Mr. Rawlins was a serial fraudster, willing to deceive
again and again and again, regardless of who he was deceiving

and defrauding.  And his lifestyle, your Honor, as you saw

through the American Express bills, as you saw through all the

records at trial, he was living -- he was taking every ounce of

that money he stole and putting it to his own benefit and

enjoying it.

          Your Honor, the defense in their submission makes much

of Mr. Rawlins' family relationships and of his wife on the

degree to which she has good relationships with them and the

degree to which they depend on him.  In our view that makes

this fraud all the more condemnable, all the more despicable,

because knowing that he had a family that depended on him,

knowing that he had sons who had no other source of income, and

knowing that he had a wife who depended on him physically and

emotionally, he built their entire future on essentially this

fraud, which is now collapsed and will now destroy or

significantly inhibit their lives.  It's not a reason for

leniency for this defendant.  It's a reason for harsher

punishment.

          Your Honor, finally, the defendant to this day has

shown absolutely no remorse.  Again, there is no mitigation in

his reaction to his charges, in his reaction to his conduct.

He has shown no remorse.  So even there, your Honor, there is

nothing mitigating about the defendant's conduct.

          So finally, to end on the factor of deterrence, a very

stiff sentence is necessary here to send a message that when

1    you commit a horrible fraud, when you let it carry on for years

2    and years, taking millions of dollars, and make every effort to

3    escape responsibility and ultimately show no remorse, you must

4    serve a very substantial and lengthy time of incarceration.

5              Thank you, your Honor.

6              THE COURT:  Thank you.

7              Mr. Brill?

8              MR. BRILL:  Your Honor, sentencing law, as your Honor

9    knows, mandates the Court to take a parsimonious view of

10   sentencing.  And given the fact that the guidelines are now

11   advisory, it is entirely clear to all of us that practice that

12   the Court is free to view not only the conduct engaged by the

13   defendant, whatever that conduct is, but to also balance that

14   with other factors that could mitigate a guideline sentence.

15             And despite what the government says with respect to

16   those particular factors, we believe that they do rise to the

17   level of mitigating.  And we think that despite the conviction,

18   and despite the conduct that has been presented against

19   Mr. Rawlins, that his personal history and, most importantly,

20   his family background, do and should allow this Court to

21   mitigate what is essentially an eleven-and-a-half-year sentence

22   on the bottom of the guidelines.

23             And so with respect to that, your Honor, I think that

24   Mr. Rawlins' personal history, again, is important enough to

25   persuade the Court to sentence Mr. Rawlins to something below

eleven-and-a-half years, which we believe is excessive.  And we
believe that your Honor's interests in sentencing this
defendant and any defendant would still be met below that
particular range.

        I think, first and foremost, what I think stands out
with respect to Mr. Rawlins' background and personal history is
his family's reliance on him.  It is true that he is
essentially the center point of his family and the glue that
holds them together.  There are differences or arguments as to
how that came to be and why that is, but that doesn't deny the
fact that that is the reality at this point; that Mr. Rawlins'
wife, two sons mostly, parents that all live near or around
Mr. Rawlins do depend on him in various ways; most importantly,
his wife of 38 years.

        You have read what was presented in our sentencing
submission.  She has suffered a fallback in 1993, and we've
been told hasn't been the same since.  As a result of that she
has suffered physical disabilities, like head injuries,
cognitive disabilities, emotional disabilities, but also
physical disabilities, like fractured vertebrae, arthritis,
migraines, insomnia, trouble walking and the need to continue
to be treated medically.  That's reality.

        And we would ask that it's not ignored when the Court
imposes a sentence on Mr. Rawlins.  And I think to balance a
sentence with that particular fact, again, does not interfere

1   with what the Court is trying to convey and the message that

2   the Court is trying to convey when it imposes sentence on

3   Mr. Rawlins.

4           I think it's important to mention that probation came

5   to that similar conclusion, which is that in their probation

6   report, where they are permitted to recommend to the Court as

7   to what factors they believe warrant a sentence outside of the

8   guidelines, their statements to the Court were that the fragile

9   health of the defendant's wife is a mitigating factor that may

10  warrant a sentence below the guidelines or outside the

11  guidelines.

12          And so obviously the Court doesn't have to adhere to

13  that recommendation, but I think that probation certainly takes

14  their calculations and their findings seriously.  I wouldn't

15  describe probation as a department that generally goes easy on

16  defendants.  And certainly the fact that they found this

17  particular fact to be something that the Court could take into

18  consideration to warrant a sentence outside the guidelines I

19  think is something that the Court -- I would ask the Court

20  should consider.

21          In Ms. Rawlins' letter, I thought what said it all was

22  that she describes Mr. Rawlins as his world, her stability and

23  her confidence.  And again, obviously in an

24  eleven-and-a-half-year sentence at this stage, it's

25  catastrophic, and that we would ask that the Court takes that

G62ERAWS

1    into consideration when imposing a sentence as to what is

2    appropriate under -- using 3553 factors.

3              In addition to his wife, he has two sons that are very

4    close to him; mostly his son Brandon, who also has medical

5    issues but lives with Mr. Rawlins, along with his wife Molly

6    and their son Ethan, which is Mr. Rawlins' grandchild.  They

7    live in Mr. Rawlins' house with him and his wife.  It's my

8    understanding that they've also suffered financial difficulties

9    when their home went into foreclosure, which led them to

10   Mr. Rawlins and his home.  And so by the same token as

11   Mr. Rawlins' wife, obviously an eleven-and-a-half-year jail

12   sentence is something that will, again, as with Mr. Rawlins'

13   wife, will cause tremendous disruption with respect to his son

14   and his daughter-in-law and his grandchild.

15             These are not arguments that I'm making that should

16   lead the Court to believe that I'm seeking that your Honor

17   excuse what Mr. Rawlins has been convicted of.  Despite the

18   fact that he denies it, I understand that there's a conviction

19   for very serious crimes.  But these are what would be the

20   result of a sentence that is in line with the guideline

21   sentence.

22             There is more connection and more reliance from his

23   parents as well.  They are elderly people.  His mother is just

24   about 80 years old and his father is over 80.  They have their

25   own medical issues and they rely on Mr. Rawlins as well.  So

G62ERAWS

1    these are factors that the law allows the Court to consider.

2    And I think that, given the situation, and given the guideline

3    range as to where it is, I think that the Court -- we would

4    respectfully urge the Court to consider them.

5         It doesn't stop with the family.  There are contacts

6    outside of Mr. Rawlins' family.  At least five character

7    witnesses testified here at trial.  All had positive things to

8    say about Mr. Rawlins, the positive experience they've had with

9    him, productive relationships.  Evidently no relationships that

10   involved criminal conduct, fraudulent conduct.

11        One individual who stands out is Michael Atkins, who

12   was a minister in Kentucky.  His letter acknowledged the

13   serious nature of the crimes that Mr. Rawlins was convicted of

14   but, nevertheless, sought your finding of some level of

15   leniency and forgiveness or compassion, to the extent that that

16   would enter into and be balanced within your Honor's sentence.

17   Despite the conviction, according to Minister Atkins, he still

18   thinks of Steve as his brother, his word, and still sees the

19   goodness in him.

20        So perhaps this is a complicated character, given the

21   conviction on one hand, but given his relationship and

22   connection to others on the other; one obviously being very

23   negative, and the other seemingly positive and productive.  So

24   it seems as if a sentence should take that into consideration.

25        I will also mention, as I did in my memorandum, I'm

1    not sure this necessarily goes to the nature and circumstances

2    of the case, but just perhaps in your Honor's decision as to

3    what is a just sentence and what is an appropriate sentence,

4    that this guideline is dictated almost entirely by the loss

5    amount in this case.  And I think there's been much written

6    about that.  There are judges within this district that have

7    written expansively on the idea that there is something that is

8    hard to swallow when a guideline range is raised to a certain

9    level, based substantially by the amount of loss that is found,

10   in that it has essentially a disproportionate effect on the

11   guideline calculation that it accounts almost entirely for the

12   ultimate guideline calculation.

13          Here, a base offense level of 7, enhancements that

14   we've argued that are serious enhancements that allow the Court

15   to enhance the guidelines two levels but yet the loss amount

16   allows this Court to make a finding of an additional 20 levels,

17   which is obviously completely disproportionate to the other

18   enhancements to the base level as well, it's obviously a

19   factor.  I'm mindful of the idea that the Court should take

20   into consideration the allegations of the money that was taken.

21   But it seems to me that the Court should not necessarily rely

22   entirely on the idea that the guidelines believe that this

23   amount rises to a particular guideline level and thus equals a

24   particular guideline range, but that the Court should on its

25   own -- obviously being advised by it, but use what it believes

to be the appropriate sentence, given mostly what Mr. Rawlins'

conduct was, and perhaps secondarily the idea of the loss that

was found by the Court.

So I think that's an important point. And I think

courts in this district and others continue to not disregard

loss but to use it as less of a factor than it exists within

the guideline calculation.

Lastly, I, again, will address just the interests of

sentencing, which I know are extremely important to this Court.

And that is that a sentence below the guideline level of the

low end, eleven-and-a-half years, will certainly be a just

punishment. The fact that his family, Mr. Rawlins' family, has

already been impacted and will certainly be impacted by a jail

sentence is punishment and a punishment that could be just also

just by sentencing Mr. Rawlins to a sentence below

eleven-and-a-half years. The idea that the Court needs to

protect society from further crimes, I think, can be met by a

sentence of less than eleven-and-a-half years for a 60-year-old

individual who has no prior convictions.

And then with respect to deterring Mr. Rawlins,

certainly a jail sentence below the guideline sentence will

achieve that effect, but also, generally, in that a sentence

below eleven-and-a-half years will certainly get the message

across that the Court wants to get across, which is that crime

does not pay, and this type of crime does not pay. And I think

G62ERAWS

1    that can be met by a sentence below what we would argue to be

2    excessive and inappropriate.

3              So I would again urge the Court to take into

4    consideration his dedication as a father, as a son, as a

5    husband, as someone who has been responsible by all accounts to

6    these people in his family, and the fact that those people rely

7    on him and the hardship that would involve and result with a

8    sentence at guideline level.

9              So, respectfully, we ask that your Honor impose a

10   sentence below the guideline range.

11             THE COURT:  Thank you, Mr. Brill.

12             Go ahead.

13             MR. DEFILIPPIS:  Your Honor, only one thing, which is

14   just for the accuracy of the record, the probation department

15   found that Ms. Rawlins' condition was not a mitigating factor.

16   They said in the absence of --

17             THE COURT:  What page are you on?

18             MR. DEFILIPPIS:  Page 29.

19             THE COURT:  I think it was an absence of

20   documentation.

21             MR. DEFILIPPIS:  In the absence of verification of his

22   wife's condition and Rawlins' own assertion that she is

23   basically self sufficient, the probation office does not

24   consider her fragile health to be a mitigating factor

25   warranting a sentence outside of the advisory guidelines range.

 1    So I just wanted -- I didn't want there to be confusion about

 2    their conclusion.

 3              MR. BRILL:  Yeah, no, I --

 4              THE COURT:  You were referring to -- where is the

 5    statement you were referring to?

 6              MR. BRILL:  That's what I'm trying to find, your

 7    Honor.  I'll find that.

 8              THE COURT:  That was the bottom line conclusion, as

 9    was the recommendation of a 108-month sentence, which is the

10    bottom of the guideline range, absent the obstruction

11    enhancement.

12              MR. BRILL:  Yes.  I'm just searching for -- I don't

13    think I put pages.  I put part F.  Yes.  Page -- well, page 25,

14    part F, paragraph 109:  The fragile health of the defendant's

15    wife is a mitigating factor which may warrant a sentence

16    outside the advisory guideline range.

17              I don't know if she changed her mind.  I'm not sure

18    what was going through Ms. Dunn's mind.  But that's the fact --

19    that's the statement I was relying on.

20              THE COURT:  Understood.  Thank you.

21              Mr. Rawlins, you have no obligation to make a

22    statement, but if you'd like to, you may do so now.

23              THE DEFENDANT:  Thank you, your Honor, for the

24    opportunity to say a few words.

25              Just looking at everything that's gone on, the

appearance of me is one of a master criminal and a deceiver and

a cheat and all those things.  I would like for the Court to

know that I am loyal, I'm faithful and I am kind.  Loyal to a

fault quite often.  I have a wife who is very dependent on me,

a grandson who adores me, and a son living with me with his

wife and that grandson, due to health issues of his own.

          In 1993 -- and I might back up a bit.

          My wife and I married in 1979.  And in 1982 she

suffered the loss of a set of twins midstage pregnancy, which

caused her severe mental issues at that point, but then two

following sons and things went on, etc.  And I moved into an

outstanding position with the firm.  We were building a new

house.

          And in 1993 she was -- this was in 1993, I should

add -- she was at that house moving some things in the attic,

hit her head on a cross beam and fell 16 feet, head first, to

the floor.  She suffered two concussions, some brain bleeding,

broke up basically the entire right side of her body when she

hit.  And when they called me -- the builders called me at my

office.  And I beat the ambulance to the house.  And when I

did, of course, I was there when the paramedics came in.  And

they began asking her questions about herself; you know, who

are you?  What's your name?  How old are you?  Every question

to a tee she answered as if she was me.  And for the next year,

near year, she was amnesic, if that's a word.  She knew only

G62ERAWS

1    me, our two sons and our dog.

2            A year after the fall it became apparent that I wasn't

3    going to be able to meet the demands of the position I had.  So

4    I went into private practice, where I would have more control

5    over my scheduling and being able to take care of her.  She was

6    left with the motor skill disabilities, lots of anxieties, lots

7    of head issues; obviously severe pain from broken bones, etc.

8            To this day I still have to make sure her medications

9    are correct every day, that everything is in place, that -- she

10   has no math skills.  She lost those in the fall.  Can do very

11   little around the house as far as cleaning and other things.

12   But for those years from 1994 forward, I have taken care of

13   her, and also my other son as well, in different ways.  But

14   I've taken care of her to the point where whenever there's

15   separation, she panics.  We were at the grocery one day not too

16   long ago, and I actually went to the restroom.  And while I was

17   in there, I got a phone call, and it was her.  And she was

18   panicking.  She didn't know where she was.  And so I had to go

19   and get her.

20           She went through back surgery in 2011 that alleviated

21   some of the pain.  Two weeks after her back surgery, her twin

22   brother committed suicide, which forced a huge setback on her

23   from a mental standpoint.  For her -- and we'll be married 37

24   years in a month and a half.  For her, I am what is the center

25   of her world.  And I keep her world going.  I would have had

G62ERAWS

her here for the proceedings.  I would have had others here,
but she can't make the trip.  And she emotionally couldn't
stand it either.

        So she will soon be homeless because she will lose our
home.  Without me, she will lose our home.  She will lose
everything.  And I really don't know what will become of her if
that happens.

        My parents celebrate their 61st anniversary Saturday.
My dad has Parkinson's.  He has vascular disease.  He's had
five bypasses.  He's had a stroke.  He's had carotid surgery.
My mom has congestive heart failure.  And they depend on me for
a lot of things; most especially, the bulk of what I do now for
income is I run my mom's barn.  And that's not something I have
to get on tractors for and do things like that.  I can do that
from my home.  And it's very successful, I might add.

        They, too, will be impacted heavily by whatever
happens to me.  But most especially, they've all been impacted
by the embarrassment, the -- everything that's gone along with
this entire proceeding.

        I'd like to say that one of my biggest faults -- and I
have plenty -- it's been said that I have no remorse.  Well, I
have plenty of remorse, because one of the things that I have
is loyalty.  And had I not been loyal, we wouldn't be here
today.  Because in 2009, when Brian Sharp exercised
infidelities with his then wife, it was recommended during the

1 divorce proceedings that the company be broken up, sold, etc.

2 He asked me to work with him to make sure that that didn't

3 happen.  I agreed.

4   His shareholders, who -- his former shareholders who

5 he bought the company from, one of whom was one of my character

6 witnesses, came to me because they were so upset with the

7 situation, the cheating, etc.  Wanted to foreclose on the

8 company and wanted to make me the president of the company.

9 Number one, I had no desire to be president of the company.

10 Number two, my loyalty was such that I told him no, I would

11 continue to work with him to get him the financing to make sure

12 the company stood.  And obviously the growth of the company was

13 impacted through the divorce.

14   By the same token, there were attempts that we were

15 still making to grow the company and grow other aspects of it.

16 I had been asked to do certain things to make sure certain

17 employees and certain others were not aware of how much money I

18 was making and what he was paying me to do these things.  I

19 trusted him, and I told him I'd take whatever aspects there

20 were to take, should some of those things be discovered.

21   I also trusted the gentleman named Franklin Palm, who

22 I really cared significantly about.  And he deceived both me

23 and Mr. Sharp.  And that extremely hurt me business wise,

24 Mr. Gaddes, of which I'm terribly sorry for that situation, and

25 the entire situation.

G62ERAWS

1        I appreciate the opportunity to be able to say that.

2   Mostly, I appreciate any consideration that can be given for my

3   wife and my family and those who still do depend on me.

4        Thank you.

5        THE COURT:  Thank you, Mr. Rawlins.

6        All right.  Counsel, I'm going to take just a brief

7   moment to finalize my sentencing conclusions.  Anything else to

8   raise before I do so?

9        MR. DEFILIPPIS:  Not from the government, your Honor.

10       THE COURT:  I'll return shortly.  Thank you.

11       (Recess)

12       THE COURT:  I just want to ask, before I get to

13  sentence with counsel, whether anyone wanted to address -- I

14  think we've agreed that the question of specific restitution

15  amount, although I will make a conclusion that restitution is

16  appropriate, we'll take the 90 days permitted to -- for me to

17  hear additionally from whoever wants to weigh in on specific

18  amount of restitution, in light of the letters received by me

19  today from the victim entities.  So I'll cabin that.

20       But with respect to the proposed forfeiture order,

21  Mr. Brill, did you want to take anything up?  And

22  Mr. DeFilippis, to explain the amount of $10,110,577.09?

23       MR. DEFILIPPIS:  Yes.

24       THE COURT:  Go ahead.

25       MR. DEFILIPPIS:  So, your Honor -- and I believe this

G62ERAWS

1    is entirely consistent with your factual findings today, but

2    the -- so that includes first the losses to Prime Health, as

3    proven at trial, which includes -- and the government's

4    sentencing submission didn't break out that 8 million number as

5    between Prime Health and Core Choice.

6              THE COURT:  Right.

7              MR. DEFILIPPIS:  But it includes -- and I don't have

8    the exact number here, but approximately 7 million something in

9    losses to Prime Health.  It then includes $294,832.68 to Core

10   Choice, which was the one year that the FBI analyzed.  It then

11   includes $2 million estimated by Agent Delzotto.  And that, as

12   it turns out, your Honor, is entirely allocated to Prime

13   Health, because that analysis was based on records at Prime

14   Health.  So the total loss amount proven at trial to Prime

15   Health becomes $9,748,744.41.

16             THE COURT:  9 million?

17             MR. DEFILIPPIS:  I'm sorry, yes, 9 million.  The Core

18   Choice loss amount is, as I said, 294,832.68.  And then if you

19   add the 67,000 in losses to Shane Gaddes, that gets you to the

20   10,110,577.09.

21             THE COURT:  So it does not include the 1.3 million or

22   the 1.5 million?

23             MR. DEFILIPPIS:  Right, because those were intended.

24             THE COURT:  I think you said those were intended loss.

25             MR. DEFILIPPIS:  Yes.

G62ERAWS

| | |
|---|---|
| 1 | THE COURT: Right. Okay. And then the items? |
| 2 | MR. DEFILIPPIS: The items are all jewelry that was |
| 3 | purchased from -- with Prime Health or Core Choice funds from |
| 4 | the American Express accounts, from the credit cards maintained |
| 5 | by Mr. Rawlins and his companies. |
| 6 | THE COURT: So the value of those -- |
| 7 | MR. DEFILIPPIS: Your Honor, we are just seeking |
| 8 | forfeiture of the property. We haven't included those in the |
| 9 | money judgment separately. |
| 10 | THE COURT: You're seeking the property? |
| 11 | MR. DEFILIPPIS: Yes. |
| 12 | THE COURT: But the value of those is not otherwise |
| 13 | incorporated into the 10 million? |
| 14 | MR. DEFILIPPIS: Right. |
| 15 | MR. BRILL: Well, I guess I'll start with that first. |
| 16 | I mean, implicit in that is whether or not that property still |
| 17 | exists. But also, I'm not -- I have no -- again, I just |
| 18 | received this today. So the list of properties is somewhat |
| 19 | brand new that I've just preliminarily talked to Mr. Rawlins |
| 20 | about. But preliminarily, there's reason to believe that none |
| 21 | of those -- none of the purchases for that property was made by |
| 22 | Mr. Rawlins. |
| 23 | So I don't know where that leaves us with respect to |
| 24 | the forfeiture order that takes that into consideration, if |
| 25 | that requires some type of hearing before the Court signs the |

G62ERAWS

1    order on that.  I don't know, but I'm not in a position to

2    consent to the order.

3             THE COURT:  Well, let's just talk procedure.  Does the

4    indictment -- does the forfeiture allegation in the indictment,

5    what does it include?

6             MR. DEFILIPPIS:  Your Honor, I think it's a generic --

7    it doesn't include a specific amount or property.  It's just a

8    generic forfeiture allegation.

9             THE COURT:  Is there any reason -- given that the

10   proposed order was provided today, is there any reason not to

11   allow Mr. Brill an opportunity to brief arguments in

12   opposition?

13            MR. DEFILIPPIS:  I don't think so, your Honor,

14   although my understanding is that forfeiture is part of this --

15   whereas restitution can be done in 90 days, my understanding is

16   forfeiture has to be pronounced at the sentencing.

17            THE COURT:  I'm looking at the presentence report.

18   Obviously there's a due process concern here.  And looking at

19   the presentence report, restitution, no specific amount's

20   provided with respect to forfeiture.  It is the generic, all

21   property that constitutes or was derived.

22            So maybe what we have to do is adjourn -- I can

23   pronounce the sentence up to forfeiture and restitution, and

24   then adjourn to reconvene, if we need to, or do it on papers,

25   if everybody agrees to that.  I'm uncomfortable proceeding

1    with -- I don't have a basis to make a determination as to the

2    specific proposed order, and certainly would be uncomfortable

3    doing so without an opportunity for Mr. Brill to be heard.

4             MR. DEFILIPPIS:  Your Honor, I think as long as your

5    Honor announces your intention of the sentence you'd impose and

6    then impose it later, I guess that would be fine.

7             THE COURT:  I think maybe what I'll do -- I mean, I

8    won't issue my -- I'll issue my sentencing conclusions orally

9    today.  Sentence will be pronounced today.  I won't enter my

10   written judgment until I hear from you each as to how you want

11   to proceed.  So it could be that we're adjourning the

12   sentencing proceeding to finalize it at another date, or it

13   could be that I can -- everyone agrees I can resolve

14   restitution and forfeiture on the papers, and then do so in an

15   order followed by the judgment, okay?

16            Mr. Brill?

17            MR. BRILL:  Yes.  I guess maybe I could just tip my

18   hand, which should be obvious, which is I'm not authorized -- I

19   guess my question to the Court is, I'm not exactly sure where

20   this ends up from my standpoint.  In other words --

21            THE COURT:  I'm not sure either.  My only point is I'm

22   going to give you time to put together whatever argument or

23   conclude that there isn't an argument.

24            MR. BRILL:  Right.  I mean, I guess the main -- the

25   thrust of -- putting aside the property, the thrust of the

G62ERAWS

1   forfeiture amount, which is based on what has been explored

2   here today, is essentially -- I mean, the Court is aware of

3   Mr. Rawlins' position on that.  So I'm not sure -- I don't see

4   myself in a position to get to a point where I can say we agree

5   with the forfeiture order, we consent to the number.

6            THE COURT:  I understand.

7            MR. BRILL:  So I think at some point it's going to be

8   the Court's prerogative to come to the conclusion it wants to

9   come to.

10           THE COURT:  I understand that.  It's only whether you

11  have any additional arguments.  And I think it's really not

12  even the dollar amount that's potentially an issue; it's

13  anything with respect to the specific properties.  Okay?

14           MR. BRILL:  Okay.

15           THE COURT:  As I said --

16           MR. BRILL:  I think that can be done on papers.  I

17  don't want to belabor it in a hearing.  I don't think I need to

18  do that for anybody's sake.  So maybe we could try to do that

19  out of court.

20           THE COURT:  Okay.  Thank you.

21           As I've stated, the guideline range applicable to this

22  case is 135 to 168 months' imprisonment.  Under the Supreme

23  Court's decision in *Booker* and its progeny, the guideline range

24  is only one factor that the Court must consider in deciding the

25  appropriate sentence.

G62ERAWS

1          I am also required to consider the other factors set

2     forth in 18, U.S.C., Section 3553(a).  And these include the

3     nature and circumstances of the offense and the history and

4     characteristics of the defendant; the need for the sentence

5     imposed to reflect the seriousness of the offense, to promote

6     respect for the law and to provide just punishment for the

7     offense; to afford adequate deterrence to criminal conduct; to

8     protect the public from further crimes of the defendant; to

9     provide the defendant with needed education or vocational

10     training, medical care or other treatment.  I am taking into

11     account the kinds of sentences available, as I've said, the

12     guideline range, any pertinent policy statement, the need to

13     avoid unwarranted sentence disparities and the need to provide

14     restitution to any victims of the offense.

15          I am required to impose a sentence sufficient but no

16     greater than necessary to comply with the purposes I've just

17     described.  I have given substantial thought and attention to

18     the appropriate sentence in this case, in light of the 3553(a)

19     factors and the appropriate purposes of sentencing as reflected

20     in that statute.

21          Mr. Rawlins stands convicted by a jury of his peers of

22     a serious and egregious crime.  Through sophisticated means,

23     unrelenting lies and intricate deception, Mr. Rawlins gained

24     the trust of friends and business associates and then abused

25     that trust through the stealing of millions of dollars.  He

G62ERAWS

preyed on numerous victims, wreaking havoc on the finances of
multiple entities.  And he did so, as far as I can tell, out of
pure and simple greed, and in order to maintain a lavish
lifestyle well beyond his means.

        Real people were affected; the entities, as we've
heard, employees of those entities, real victims.  His
ill-gotten gains were not to fund necessities, but a
multimillion-dollar home, fancy cars, clothing and jewelry and
extravagant events.  Nor was this some kind of momentary lapse
in judgment.  It went on for years.

        A significant sentence is necessary, therefore, to
reflect the seriousness of the offense, provide just punishment
for the offense, deter Mr. Rawlins and others from engaging in
this kind of corrupt, damaging and illegal behavior.  It's also
necessary to protect the public from further crimes of the
defendant, as I am concerned about what appears to be
Mr. Rawlins' unceasing, the government suggests, pathological
ability to continue to lie and deceive as to his conduct.

        I'm not sure, to be honest, Mr. Rawlins, that you
fully know where the truth ends and the lies begin.  Perhaps
you've come to believe some of your own lies.  But I know a con
when I see it, and I think so do you.

        Of course, I must and I do take into account the
history and characteristics of this defendant.  Mr. Rawlins is
60 years old.  This is his first conviction.  He's obviously

G62ERAWS

1   not a violent person.  I think, if anything affects my

2   sentence, including my bottom-line sentencing conclusion here,

3   it is those factors.

4          I also take into account his family.  I did read with

5   great care the letters from his family and friends.  I have no

6   doubt that he's a devoted family man and that he is the center

7   of support for his wife and children and aging parents.  I

8   don't disagree with the government, in some ways this makes

9   what occurred harder to understand.  And it is Mr. Rawlins'

10  actions, make no mistake about it, and decisions that puts his

11  family at continuing and serious risk.  But I do take that into

12  account.

13         I do consider Mr. Brill's advocacy as to the inclusion

14  of the loss amount as the driving factor in the ultimate

15  guideline sentence.  I don't think it's excessive here.  I

16  don't think that it overstates, particularly given the range,

17  the number of victims, the impact of the financial harm.  But

18  at base, it's my job to exercise individual judgment and decide

19  what an appropriate sentence is to meet the purposes of

20  punishment that I've described, but also taking into account

21  the history and characteristics of this defendant.  And I am

22  cautious not to impose a sentence greater than necessary to

23  achieve those purposes.

24         With all of that stated, I'll now state the specific

25  sentence I intend to impose.  Mr. Rawlins, will you please

1      rise.

2              It is the judgment of this Court that you will

3      voluntarily surrender to the Bureau of Prisons for a sentence

4      of 108 months –– and that's nine years –– to be followed by a

5      period of three years of supervised release.

6              You may be seated.

7              During your term of supervised release, the standard

8      conditions of supervised release shall apply.  In addition,

9      you'll be subject to the following mandatory conditions:  You

10     shall not commit another federal, state or local crime.  You

11     shall not illegally possess a controlled substance.  You shall

12     not possess a firearm or destructive device.  I will suspend

13     the mandatory drug testing condition because I conclude you

14     pose a low risk of future substance abuse.  You shall cooperate

15     in the collection of DNA, as directed by the probation officer.

16             In addition, the following special conditions apply:

17     You shall not incur new credit charges or open additional lines

18     of credit without the approval of the probation officer unless

19     you are in compliance with the installment payment schedule.

20     You shall provide the probation officer with access to any

21     requested financial information.  You will report to the

22     nearest probation office within 72 hours of release from

23     custody.  I do recommend you be supervised in your district of

24     residence.

25             I am going to waive the fine because I don't believe

you have the ability to pay the fine, and because I believe it

would interfere with your restitution payments, which I will

impose. I am imposing a mandatory special assessment of $100,

which shall be due immediately.

With respect to forfeiture, I do find that the

defendant is to forfeit to the United States an amount which

represents the proceeds obtained directly or indirectly as a

result of the criminal activity, based on my conclusions as to

the loss amount based on the record evidence. I do believe I

will be imposing a forfeiture order of 10,110,577.09. And I

will wait to hear if there's any further arguments to be made

in contention with either that amount or the properties that

are listed in the government's proposed forfeiture order,

specific properties. I want to give counsel an opportunity to

see if there are any further arguments to be made with respect

to those. We'll talk about when a written submission will be

due.

I will also be imposing restitution. I will wait

here, too, for the government's briefing with respect to

restitution. I want to take into account -- well, is it the

government's position that I should impose restitution

consistent with what was outlined in the presentence report or

that I should go beyond that and consider what is argued for in

the victim statements?

MR. DEFILIPPIS: Your Honor, I think it will be -- and

G62ERAWS

1    I know that the companies have been doing analysis up until

2    very recently.  So even the victim letters, some of which were

3    first prepared months ago, I think the analysis has kind of

4    gotten ahead of those letters.  So I expect it will be perhaps

5    higher than in those letters.

6          If your Honor -- I guess our assumption was that we

7    would need to have a brief hearing to allow the person who

8    prepared the spreadsheets to testify about those.  If there's a

9    way to do that on the papers, we would certainly be open to

10   that.  Given that your Honor found the 2 million by a

11   preponderance, that the 2 million number for '09 and '10

12   applied for Prime Health, I think the difference between the

13   victims' claims and the number based on your Honor's findings

14   for Prime Health may be quite small.  So this may come down to

15   basically just a Core Choice restitution issue.

16         So I guess I would say if we can resolve this on the

17   papers, it would be great.  If not, I expect it wouldn't be a

18   particularly long hearing.

19         THE COURT:  All right.  So I'll wait to hear -- we'll

20   set a schedule for briefing on forfeiture and restitution,

21   which will include what procedure everybody proposes we

22   continue by.

23         I will state here that I will be ordering the

24   defendant to make restitution, which will be payable to the

25   Clerk of the US District Court for disbursement to the victims,

G62ERAWS

1    Prime Health Services and Core Choice.  The amount will be at

2    least $8,044,577.09.  I'm going to waive the interest

3    requirement for restitution as I have the discretion to do, so

4    there will be no interest.  I believe -- unless anybody wants

5    to argue for something different.  And when I issue my ultimate

6    restitution order, I'll hear from the parties.  Otherwise, it

7    will be consistent with what has been proposed.  And the

8    parties were on advanced notice of it in the PSR.

9              I indicated I will waive the fine.  I stated as much,

10   but I just want to make sure that the government doesn't take a

11   contrary position as to voluntary surrender.

12             MR. DEFILIPPIS:  No, your Honor.  Whatever the Court

13   ordered.

14             THE COURT:  Consistent with the probation report, I do

15   deem voluntary surrender appropriate.

16             Mr. Brill, standard would be to pick a date

17   approximately six weeks from now.  I'm willing to extend that

18   for the purposes of resolution of restitution and forfeiture,

19   but I'll hear from you.

20             MR. BRILL:  So I think we would ask for an extension

21   of that.  I think, given some family matters that Mr. Rawlins

22   needs to secure before he surrenders, and given the time we

23   need to deal with the restitution and forfeiture, perhaps a 60-

24   to 90-day date would be respectfully requested.

25             THE COURT:  Mr. DeFilippis?

G62ERAWS

1      MR. DEFILIPPIS:  Your Honor, whatever the Court -- we

2  have no position.  Whatever the Court decides.

3      THE COURT:  I will ask my deputy to propose a date 60

4  days out.

5      MR. BRILL:  May I just have a moment with

6  Mr. DeFilippis.  (Pause)

7      Your Honor, if you don't mind, my question -- and

8  maybe this is an obvious answer, but my only question was one

9  of just practicality, which is the idea of forfeiture and

10  restitution seems to be travelling on two separate tracks.  So

11  in a sense, the ultimate liability is double what has been

12  lost.

13      THE COURT:  I mean, it is both allowable in the law

14  and fairly standard that the restitution and forfeiture are --

15  usually it's the same amount twice.  They serve different

16  purposes in the law.

17      MR. BRILL:  Understood.  That, I understand.

18      THE COURT:  That they may be different amounts here,

19  it's a fine question, if that means anything, but ...

20      MR. BRILL:  Yeah, I guess just the practicality.

21  Perhaps this is academic, given Mr. Rawlins' financial

22  stability at this point, but just how -- you know, the way in

23  which -- again, we don't have to take up time here, but just

24  the way in which it would occur, how do I advise Mr. Rawlins as

25  to, if money is available, who to make those payments -- what

G62ERAWS

 1    that money would be attributable to.  But perhaps I can look

 2    into that and get as far as I can to answer those questions.

 3    But that's just something I inquired of the government.

 4            THE COURT:  Thank you.

 5            So as to voluntary surrender, 60 days out is Friday,

 6    September 2nd, 2016.  I'll set with the requirement that

 7    Mr. Rawlins surrender by 2:00 p.m. on Friday, September 2,

 8    2016, to the facility that will be designated in advance of

 9    that.  As a caution, I'll just say, if you do not receive

10    notice of the designated facility to which you are

11    surrendering, you must surrender to the MCC by September 2,

12    2016 at 2:00 p.m.

13            Does either counsel know of any legal reason why this

14    sentence shall not be imposed as stated?

15            MR. DEFILIPPIS:  No, your Honor.

16            MR. BRILL:  No, your Honor.

17            THE COURT:  Sentence as stated is imposed.  I do find

18    the sentence is sufficient but not greater than necessary to

19    satisfy the sentencing purposes I described earlier.

20            Let me state that I would have reached the same

21    sentencing conclusion of a sentence of 108 months even if I had

22    ultimately agreed with Mr. Brill's arguments regarding the

23    sentencing calculation.  I do believe fully, in light of the

24    3553(a) factors, that this is the appropriate sentence, even if

25    I had not made the -- even if I had not overruled the defense

1    objections made to the calculation.

2           Mr. Rawlins, when you are released and on supervised

3    release, you will have the guidance and support of the

4    probation department as you establish your day-to-day life.

5    During your period of supervised release, I do urge you to take

6    advantage of these resources as the folks in probation are

7    committed to helping you succeed.

8           That said, I must caution you to comply strictly with

9    all the conditions of your supervised release.  If you're

10   brought back before me for a violation of those conditions, I

11   may sentence you to another term of imprisonment.  And I hope

12   and expect that you won't put me to that decision.

13          Mr. Brill, are there any requests regarding

14   designation?

15          MR. BRILL:  May I just have one moment.

16          So, your Honor, at this point we have no specific

17   recommendations for proximity of facility, in that I'm not

18   entirely sure if there are any appropriate facilities that

19   match Mr. Rawlins' designation as a nonviolent offender in or

20   around Tennessee.  So we will --

21          THE COURT:  Would you like to include that in what

22   we'll set as a submission date?  If you want -- I'm happy to

23   recommend that he be considered, given the nonviolent nature of

24   the conviction, and, therefore, I presume that that will

25   certainly be taken into account in BOP, in making its

G62ERAWS

1   designation, but that it do so with placement as close to the

2   Tennessee area as possible?

3          MR. BRILL:  That makes sense.  I just didn't want to

4   limit it unnecessarily.  But with that caveat, then that would

5   be our recommendation.

6          THE COURT:  If you determine a specific facility that

7   you'd like to recommend, I'd be happy to hear it.

8          MR. BRILL:  I think we can do that within the time

9   frame before he surrenders.

10         THE COURT:  Thank you.

11         No underlying indictments, correct?

12         MR. DEFILIPPIS:  No, your Honor.

13         THE COURT:  Mr. Rawlins, I want to inform you of your

14  appellate rights.  You do have a right to appeal your

15  conviction and your sentence.  If you're unable to pay the cost

16  of an appeal, you may apply for leave to appeal informa

17  pauperis.  The notice of appeal must be filed within 14 days of

18  judgment of conviction.

19         I have indicated that Mr. Rawlins will surrender for

20  service at the institution to be designated by the Bureau of

21  Prisons before 2:00 p.m. on September 2, 2016, or as notified

22  by probation or pretrial services, or in the absence of any

23  notification to the MCC.

24         Let's set a schedule for hearing from you on

25  restitution forfeiture.  I would say a week to hear from you.

1    I mean, I value a joint submission.  And I think really, the

2    questions are -- what I'm hoping a joint submission at least is

3    on are what procedures to follow; that is to say, if this is

4    going to be resolved by paper or if we need a further hearing.

5    And then, assuming there's agreement on that, you can put in

6    your individual arguments as to appropriate amounts or any

7    other aspect of the proposed order or amount.

8             MR. DEFILIPPIS:  So is your Honor's order that those

9    arguments would be included in this submission or in a later

10   submission?

11            THE COURT:  I think we need to get it resolved so the

12   judgment can issue, the written judgment can issue.  Is a week

13   sufficient?  You tell me.

14            MR. BRILL:  It's only that it would conflict with

15   other things, but --

16            THE COURT:  I want to give you the time you need,

17   Mr. Brill.

18            MR. BRILL:  Two weeks?

19            THE COURT:  Okay.  Why don't you see if in a week you

20   can agree on the procedure.  And then if we need a hearing,

21   then we can set a hearing date at that point.  If you agree it

22   can be done on the papers, then a week after that, I'll get

23   your separate submissions.

24            MR. BRILL:  That is fine.

25            Just a question about the judgment of conviction that

G62ERAWS

| | |
|---|---|
| 1 | your Honor mentioned with respect to notice of appeal.  Am I to |
| 2 | understand that that won't be forthcoming until we're resolved |
| 3 | with this issue, or it will -- |
| 4 | THE COURT:  I haven't looked at this in a while, but I |
| 5 | believe it starts from the issuance date of the written |
| 6 | judgment. |
| 7 | MR. BRILL:  That, I understand.  I'm saying, am I to |
| 8 | understand that that written judgment -- |
| 9 | THE COURT:  So I'm holding on that, unless someone |
| 10 | proposes something different.  I won't issue -- the whole |
| 11 | judgment will include -- because we have to resolve forfeiture |
| 12 | before I can issue the judgment.  Restitution could wait, but I |
| 13 | won't issue the judgment until this is resolved, until at least |
| 14 | I hear from you in a week. |
| 15 | MR. BRILL:  That was my question.  So that the |
| 16 | judgment will be held until we resolve the issue of forfeiture. |
| 17 | THE COURT:  Yes. |
| 18 | MR. BRILL:  And potentially restitution. |
| 19 | THE COURT:  Mr. DeFilippis, do you agree with that? |
| 20 | MR. DEFILIPPIS:  Yes, I think that's right, your |
| 21 | Honor. |
| 22 | MR. BRILL:  Thank you. |
| 23 | THE COURT:  I want to make sure everyone is cautious |
| 24 | on that point.  So my intention is not to issue the written |
| 25 | judgment on any of the sentence pronounced today until at least |

G62ERAWS

1    a week from now, but more likely two weeks from now.

2          MR. BRILL:  Yes.  And so to follow through with that

3    cautious tone, from my standpoint -- and I think this is solid

4    legal ground -- that notices of appeal are triggered once the

5    judgment is issued by a sentencing court.  And so that is what

6    I will do, in that I will await that particular sentencing

7    judgment and then comply with the requirements of filing the

8    notice of appeal.

9          THE COURT:  Mr. DeFilippis?

10         MR. DEFILIPPIS:  That's the government's

11   understanding, your Honor.  Essentially we understand your

12   Honor to have announced your intention of what sentence to

13   impose, but that sentence will issue when the judgment does.

14         THE COURT:  Correct.  That is my view, too.  And if

15   anyone recognizes any issue in that or spots any issue in that

16   that they have concerns about, you can raise that with me.  But

17   I have indicated what sentence I will impose, which will be

18   incorporated into my written judgment once we resolve

19   restitution and forfeiture, okay?

20         And presumably the 14 days will run from the date of

21   that.

22         MR. BRILL:  That's my understanding.

23         THE COURT:  Okay.  Thank you.

24         Anything else, counsel?

25         MR. DEFILIPPIS:  No, your Honor.  Thank you.

G62ERAWS

1          MR. BRILL:  Thank you.

2          THE COURT:  I don't know if I'll see you again, but if

3   not, again, I thank counsel.

4          And, Mr. Rawlins, best of luck to you, sir.

5          We're adjourned.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25